# United States Court of Appeals
## For the First Circuit

No. 11-1877

UNITED STATES OF AMERICA,

Appellee,

v.

CARLOS BURGOS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Torruella, Ripple,* and Howard, Circuit Judges.

Gail S. Strassfeld for appellant.
Katherine Ferguson, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

December 14, 2012

---

* Of the Seventh Circuit, sitting by designation.

**RIPPLE, <u>Circuit Judge</u>.** A jury convicted Carlos Burgos of one count of conspiring to distribute and to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846. Mr. Burgos challenges the sufficiency of the evidence to support the conviction and also claims that the district court erred in giving a "willful blindness" instruction. For the reasons set forth in the following opinion, we reverse the judgment of the district court and remand the case to the district court with instructions to enter a judgment of acquittal.

## I

## BACKGROUND

**A. Facts[1]**

### 1. Relationship between Mr. Burgos and Ramos

Mr. Burgos worked as a uniformed patrol officer for the city of Worcester, Massachusetts. Between 2005 and March 2009, he was assigned to a specific beat known as "Route 13," which encompasses a high-crime area known as "Main South."[2] In addition to uniformed police officers, members of the Worcester Police Department's Vice Squad and Gang Unit regularly patrol the area.

---

[1] Because the jury found Mr. Burgos guilty of the charged crime, we view the evidence, and all reasonable inferences therefrom, in the light most favorable to the Government. <u>See, e.g.</u>, <u>United States</u> v. <u>Casas</u>, 356 F.3d 104, 126 (1st Cir. 2004).

[2] <u>See</u> R.326 at 109.

Mr. Burgos's brother-in-law worked at an automobile repair shop located in Main South, G & V General Auto Repair ("G & V"). Both during and after this time, Rolando Ramos also worked at G & V;[3] Ramos was not a mechanic, but rather helped by "taking money . . . [to] the bank," "pick[ing] up parts that were needed in the shop" and "driving the . . . lift."[4] Mr. Burgos's brother-in-law described Ramos as "the shop's tow truck driver."[5] In addition to his legitimate work at G & V, Ramos also ran a marijuana distribution network.[6] Although Ramos never met his suppliers at G & V, he did meet with customers and transact sales at that location. Ramos testified that he spoke to at least one of his co-workers at G & V about his illicit drug business,[7] but that

---

[3]  Ramos's brother-in-law, Ramon Valerio, owned G & V.

[4]  R.327 at 85.

[5]  R.328-1 at 72.

[6]  Ramos, who testified on behalf of the Government pursuant to a plea agreement, estimated that he distributed approximately 2,500 pounds of marijuana between 2005 and his arrest in March 2009. R.327 at 57-58. During the last five months of the conspiracy, Ramos also began distributing cocaine. Id. at 58. He obtained a total of approximately four kilograms of cocaine, but, when asked how much cocaine he sold, Ramos testified that he "c[ould]n't say exactly, because [he] was using more than [he] was selling." Id.

[7]  See id. at 81.

3

he did not discuss his drug business with, or conduct any sales in the presence of, Mr. Burgos's brother-in-law.[8]

While his brother-in-law worked at G & V, Mr. Burgos would go to the garage "very frequent[ly]" to visit and to have his car repaired.[9] On one of these occasions, Ramos overheard Mr. Burgos tell his brother-in-law that the area was "hot," which Ramos took to mean that it was being watched by the police.[10]

Sometime before April 2006, Mr. Burgos's brother-in-law stopped working at G & V, and, consequently, Mr. Burgos used G & V less frequently for repairs.[11] The mechanics at G & V continued to give Mr. Burgos a discount; however, the extent of the discount varied among the mechanics, who worked on commission and set their own prices for car repair services.

Ramos characterized his relationship with Mr. Burgos as a "friendship."[12] Ramos met some members of Mr. Burgos's family, but never went into his house; the only time that Ramos went to Mr. Burgos's house was to tow a car. Mr. Burgos never went to

---

[8] See R.328-1 at 43.

[9] R.327 at 90.

[10] Id. at 94-95.

[11] Ramos estimated that Mr. Burgos brought his car in "[a]bout three times" after his brother-in-law left G & V. Id. at 106. Earlier in his testimony, Ramos stated that, after Mr. Burgos's brother-in-law left G & V, Mr. Burgos brought his car in "[n]ot often, once a year, or once a month depending on what it was." Id.

[12] Id. at 101.

4

Ramos's house. On one occasion, Ramos helped Mr. Burgos's sister and her infant son by towing her car and repairing a flat tire, which he did without charging her. The only indication of a personal relationship, rather than a professional relationship, is a phone call from Mr. Burgos to Ramos on Christmas day in 2009.[13] On other occasions, Mr. Burgos purchased from Ramos a GPS navigation system for his father and a laptop computer. Ramos sold both items to Mr. Burgos for less than retail price.[14] Mr. Burgos also purchased a discounted set of vehicle tire rims at G & V. According to the record, the rims were displayed in the garage with a "for sale" sign on them;[15] it is unclear whether Ramos personally was selling the rims or merely rang up the sale as an employee of G & V.

In late 2008, Ramos noticed that a police officer who was known to work with the Worcester Police Department's "Gang unit" was watching G & V through binoculars.[16] The next day or so, Ramos told Mr. Burgos that someone was watching the garage, and

---

[13] That phone call was not recorded.

[14] Ramos sold the laptop, which he later testified sold for $900 to $1,200 in stores, to Mr. Burgos for $200. Id. at 97. Ramos sold a GPS, which he later testified retailed for "about $129" to Mr. Burgos's father, although Mr. Burgos conducted the transaction, for $60. Id. at 119.

[15] Id. at 99-100. The set of four rims, according to Ramos's later testimony, retailed for $1,000 to $1,200; Mr. Burgos paid $400 for them. Id. at 99.

[16] Id. at 113-14.

Mr. Burgos "told [him] that it could be that the place was hot."[17] Ramos understood "hot" to mean that G & V was being watched; he told Mr. Burgos, "I'll be careful."[18]

Ramos later testified that he told his drug customers that he "had the protection of a police officer," although he did not "mention that person by name."[19] These statements convinced at least one individual that it was safe to purchase marijuana from Ramos. At trial, Ramos disclaimed any truth to these statements: "[W]henever I was high, I was trying to bluff and appear as if I was the king."[20] Ramos characterized his statements as "bragging or gloating" and explained that, contrary to what he told people, he did not "have a cop under [his] wing."[21] After being arrested, Ramos told one of his drug customers, who also had been arrested, that "he d[id]n't understand why the cop [Mr. Burgos] got arrested with [them]."[22] Ramos also testified that he "never" told Mr. Burgos that he was a drug dealer, "never" discussed drugs with

---

[17]  Id. at 115.

[18]  Id. at 116.

[19]  Id. at 124.

[20]  Id. Ramos testified that he used narcotics, including cocaine and Percocet, on a daily basis.

[21]  R.328-1 at 33.

[22]  Id. at 56; see also id. at 67 (drug customer agreeing that Ramos had stated that he (Ramos) "didn't know why [Mr. Burgos] got arrested, because [Mr. Burgos] didn't do anything").

him and did not engage in any drug deals when Mr. Burgos was present because he did not want Mr. Burgos to know about his drug business.[23]

## 2. Investigation of Ramos

Beginning in early 2009, a multi-agency drug task force began investigating Ramos's drug distribution network. Officers from several agencies, including the Worcester Police Department, the Massachusetts State Police, the Drug Enforcement Administration ("DEA") and the United States Postal Inspection Service conducted surveillance of Ramos at G & V, as well as at other locations. As part of their surveillance efforts, the officers drove unmarked vehicles. Of particular relevance to this appeal is that Worcester Detective Kellen Smith drove a white Ford Explorer, Worcester Detective Jeff Carlson drove a maroon Dodge Intrepid and Massachusetts State Police Officer Nicholas Nason drove a green Ford Escape.

On the morning of January 14, 2009, the officers conducting surveillance on G & V saw Mr. Burgos's marked police vehicle parked in a parking lot on the same street as the garage.[24] They watched as Ramos's vehicle drove up next to Mr. Burgos's, and

---

[23] R.327 at 116; R.328-1 at 40, 19.

[24] This was not unusual; one of the officers later agreed that "officers from time to time park[ed] in the . . . parking lot." R.326 at 153.

7

the two men proceeded to have a five- or ten-minute conversation. According to Ramos's later testimony, Ramos had seen Mr. Burgos sitting in his marked police vehicle; he pulled next to Mr. Burgos and told him he "was being followed by cars," one red and one white, and he asked Mr. Burgos who was following him.[25] At the time he asked, Ramos was "75 to 90 percent [certain] that they were police cars."[26] Ramos later testified that he "wanted to make sure that [he] knew who it was that was following [him]."[27] According to Ramos, the meeting was not prearranged; when asked why Ramos turned to Mr. Burgos to obtain that information, he testified: "I don't know. I saw him, and I went up to him and asked him."[28] Mr. Burgos told Ramos "that he was going to find out what they were."[29]

Later that day, Ramos called Mr. Burgos; that conversation was captured by an existing wiretap. That transcript, which was introduced at trial, reads as follows:[30]

BURGOS: [Aside . . . hold on, no . . .] Hello!

---

[25] R.327 at 128.

[26] Id. at 129.

[27] Id.

[28] Id.

[29] Id.

[30] The conversation was in Spanish, but later was translated into English.

8

RAMOS:      Tell me, Carlos.

BURGOS:     How are you?  What's up?

RAMOS:      Tell me, did you find out about
            that for me, or not?

BURGOS:     Uh . . . yes, but no . . . I don't
            know if for there . . . there were
            two.  Uh . . . the white one and the
            red one.

RAMOS:      Yes, but I saw that one already,
            there's the white one and a green
            van, too.

BURGOS:     [Unintelligible].

RAMOS:      A green one.  Did you hear?

BURGOS:     But I don't know if it is for over
            there, but, uh . . . they're down
            there, yes.

RAMOS:      I know they're down here.

BURGOS:     Yes, so let's take it easy for now.

RAMOS:      Yes, I know, I know, I know . . .
            that's why I told you that.  I know.

BURGOS:     Yes, yes, yes . . .

RAMOS:      Okay.

BURGOS:     Okay?

RAMOS:      Okay.

BURGOS:     Okay.  Bye.[31]

_____

31   Id. at 130-31.

9

Ramos later testified that he understood that Mr. Burgos was telling him that police were observing either Ramos or G & V,[32] and telling him "[t]hat [he] had to take it easy if [he] was doing something against the law."[33] About an hour after that conversation with Mr. Burgos, Ramos called his marijuana supplier and informed him that police were in the area. Shortly after that, Ramos called a customer and gave him similar information. After these conversations, which also were captured by the wiretap, the officers changed their surveillance vehicles. At no point in their investigation did the officers focus any surveillance efforts on Mr. Burgos.

After additional investigation, the officers executed search warrants on Ramos's house, where they recovered marijuana, cocaine and a firearm.

## B. District Court Proceedings

A grand jury charged Mr. Burgos with one count of conspiring to distribute and to possess with intent to distribute marijuana. Ramos and Detectives Smith and Carlson were the chief witnesses for the Government. In addition to the events set forth

---

[32] Ramos testified that he understood Mr. Burgos to mean "that we were being watched," but counsel did not draw out any further explanation as to whether Ramos meant "we" to mean G & V, his marijuana distribution network or Ramos himself. Id. at 132.

[33] Id. at 133.

10

above, Detectives Smith and Carlson testified concerning their interactions with Mr. Burgos while serving on the police force together.

Detective Smith testified that he began working in Route 13 when he was serving in the Community Impact Division. He explained that he "concentrated a lot of effort and time there in the Antiviolence Unit, and in the vice squad we do a lot of work down there as well."[34] Before he joined the Vice Squad, Detective Smith would see Mr. Burgos "quite frequently," but "didn't work directly with [Mr. Burgos] on many occasions."[35] As an officer on the Vice Squad, Detective Smith saw Mr. Burgos "[s]everal times a week"; he stated that "[a] typical area that I would run into Carlos was at the -- the pumps," by which Detective Smith meant "[t]he gas pumps at the Worcester Police headquarters."[36] Detective Smith also provided general information about the Vice Squad. Detective Smith testified that the Vice Squad conducts "[n]arcotics investigations, prostitution investigations, and illegal gambling investigations."[37] He further stated that the Vice Squad spends approximately ninety percent of its time on narcotics investigations, nine percent on prostitution-related crimes and "a

---

[34] R.326 at 110.

[35] Id.

[36] Id. at 111, 113.

[37] Id. at 106.

11

very small fraction" on illegal gaming and that he was familiar with those percentages before joining the Vice Squad.[38]

Detective Carlson, who has "worked [his] whole career in the Main South area, both in the Community Impact Division and in the vice squad," testified that, "[w]hen [he] was assigned to the Impact Division, [he] would encounter Carlos almost on a daily basis throughout the day."[39]  When Detective Carlson was assigned to the Vice Squad, Mr. Burgos "congratulated" him and told Detective Carlson to "do a good job up there."[40]  After Detective Carlson joined the Vice Squad, however, he and Mr. Burgos "didn't really work on operations together."[41]  Detective Carlson explained that they

> would encounter each other on the street on a
> fairly regular basis.  Again, route officers
> frequently assist the vice squad with stops and
> arrests; and if there was some type of emergency
> call and I wasn't tied up doing vice squad duties,
> I would certainly go to that area and assist route
> officers with their -- their 911 call."[42]

At the close of the Government's evidence, Mr. Burgos moved for acquittal under Federal Rule of Criminal Procedure 29. The district court denied the motion.  Mr. Burgos did not call any

---

[38]  Id. at 107.

[39]  Id. at 178.

[40]  Id. at 179.

[41]  Id. at 181.

[42]  Id.

12

witnesses.  At the request of the Government, and over Mr. Burgos's objection, the court gave the jury a willful blindness instruction; it stated:

> The second element that the government must prove beyond a reasonable doubt is that the defendant knew the essential purpose or nature of the conspiracy charged in the indictment.
>
> The government must prove beyond a reasonable doubt that the defendant knew that the essential purpose and general aim of the conspiracy was: (1) to possess a controlled substance with intent to distribute it or (2) to distribute a controlled substance.  Although you need not find that the defendant knew that the conspiracy involved marijuana specifically, you must find that he knew it involved a controlled substance.  It is not enough for the government to prove merely that the defendant knew that the conspiracy involved something illegal.
>
> It is, of course, impossible to prove directly the inner workings of the human mind.  Thus, in deciding whether the defendant acted knowingly, you may consider his statements and actions, the surrounding facts and circumstances, and any reasonable inferences that may be drawn from those facts and circumstances.
>
> You may infer that the defendant had knowledge of a particular fact if you find beyond a reasonable doubt that he deliberately avoided learning a fact that otherwise would have been obvious to him, under the circumstances outlined below.
>
> In order to infer knowledge of a fact under such circumstances, you must find beyond a reasonable doubt that the government has proved two things:
>
> First, that the defendant was aware of a high probability of the existence of a fact; and

13

Second, that the defendant consciously and deliberately avoided learning of that fact; that is, that he willfully made himself blind to the existence of the fact.

You may draw that inference, but you do not have to; it is entirely up to you.

Conscious and deliberate avoidance of knowledge may be established by proof that the defendant deliberately refused to ask questions about, or make inquiries about, or investigate, suspicious activities once his suspicion had been aroused.

Mere negligence or mistake in failing to investigate or learn a fact is not enough. Thus, it is not enough that a reasonable person in the defendant's position would have known a fact, or would have made further inquiry; you must find that the defendant consciously and deliberately remained ignorant of that fact.

It is not enough for the government to prove that the defendant knew, or was willfully blind to, the fact that something illegal was occurring. Rather, the government must prove beyond a reasonable doubt that the defendant knew, or was willfully blind to, the fact that the illegal activity involved a controlled substance.

This instruction applies only to the "knowledge" element of the conspiracy. The third element of a conspiracy -- that the defendant willfully joined the conspiracy cannot be . . . established by willful blindness.[43]

The jury convicted Mr. Burgos on the single count of the indictment, and the district court denied his renewed motion for acquittal. Mr. Burgos timely appealed.

---

[43]  R.329 at 63-66.

## DISCUSSION

We review de novo the district court's denial of a Rule 29 motion for judgment of acquittal, viewing all the evidence in the light most favorable to the jury's verdict. United States v. Pérez-Meléndez, 599 F.3d 31, 40 (1st Cir. 2010). The ultimate question for this court is whether the evidence, both direct and circumstantial, and all plausible inferences drawn therefrom, would allow a rational jury to conclude that the Government had proven each element of the crime beyond a reasonable doubt. Id.

## A. Standard for Sufficiency of the Evidence

### 1.

Although the standard of review incorporates "prosecution-friendly overtones . . . , appellate oversight of sufficiency challenges is not an empty ritual." United States v. Ortiz, 966 F.2d 707, 711-12 (1st Cir. 1992). This is because the reasonable-doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error." In re Winship, 397 U.S. 358, 363 (1970). As the Court explained in Winship,

> The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the

conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt. . . . To this end, the reasonable-doubt standard is indispensable, for it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.

Id. at 363-64 (citation omitted) (internal quotation marks omitted). The reasoanble-doubt standard not only gives "concrete substance for the presumption of innocence," id. at 363, but also gives the citizenry confidence in the fairness of its criminal justice system:

[U]se of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

Id. at 364.

"Despite the importance of the reasonable doubt standard in safeguarding the rights of criminal defendants, the term has eluded clear definition." United States v. Olmstead, 832 F.2d 642, 645 (1st Cir. 1987). Indeed, we have observed that "[m]ost efforts at clarification result in further obfuscation of the concept." Id. Nevertheless, "we have attempted to describe the level of

16

certainty necessary to support a criminal conviction." <u>Morgan</u> v. <u>Dickhaut</u>, 677 F.3d 39, 47 (1st Cir. 2012). We will "not give credence to 'evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" <u>Leftwich</u> v. <u>Maloney</u>, 532 F.3d 20, 23 (1st Cir. 2008) (quoting <u>United States</u> v. <u>Spinney</u>, 65 F.3d 231, 234 (1st Cir. 1995)). The existence of some metaphysical doubt, however, does not require a verdict in favor of the accused; "it is enough that all 'reasonable' doubts be excluded." <u>Stewart</u> v. <u>Coalter</u>, 48 F.3d 610, 616 (1st Cir. 1995). A verdict satisfying this standard "may be supported by circumstantial evidence alone," <u>Morgan</u>, 677 F.3d at 47, but we also have noted the limitations of circumstantial evidence: "[W]e are loath to stack inference upon inference in order to uphold the jury's verdict." <u>United States</u> v. <u>Valerio</u>, 48 F.3d 58, 64 (1st Cir. 1995). In the end,

> [i]f the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction. This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury <u>must necessarily entertain</u> a reasonable doubt.

<u>United States</u> v. <u>Flores-Rivera</u>, 56 F.3d 319, 323 (1st Cir. 1995) (alterations in original) (internal quotation marks omitted).

**2.**

17

In this case, Mr. Burgos was convicted of conspiracy to distribute and to possess with intent to distribute marijuana. To affirm his conviction, we must determine whether a reasonable jury could conclude that the Government proved beyond a reasonable doubt each element of the crime: (1) "a conspiracy existed," (2) Mr. Burgos "had knowledge of the conspiracy" and (3) Mr. Burgos "knowingly and voluntarily participated in the conspiracy." United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011). With respect to the second element, the Government must establish that the defendant had knowledge of the crime charged. Pérez-Meléndez, 599 F.3d at 43. Showing that the defendant had knowledge of generalized illegality is insufficient, id.; the Government must show that the defendant knew the conspiracy involved a controlled substance, but need not show that the defendant knew the specific controlled substance being distributed, id. at 41.

The Government may satisfy its burden in two ways: with evidence of actual knowledge or with evidence of willful blindness. Id. ("Willful blindness serves as an alternate theory on which the government may prove knowledge."). To establish willful blindness, the Government must prove that Mr. Burgos "was aware of a high probability" of the existence of a conspiracy to distribute controlled substances and that Mr. Burgos "consciously and deliberately avoided learning of that fact." United States v. Lizardo, 445 F.3d 73, 85 n.7 (1st Cir. 2006). The Government can

18

satisfy its burden with direct or circumstantial evidence, but, as we already have stated, "charges of conspiracy cannot be made out by piling inference upon inference." United States v. DeLutis, 722 F.2d 902, 907 (1st Cir. 1983) (citing Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943)).

Turning to the third element of the conspiracy charge--whether Mr. Burgos knowingly and voluntarily participated in the conspiracy--"the evidence must establish that the defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy." Dellosantos, 649 F.3d at 116. A defendant "must in some sense promote [the conspiracy] himself, make it his own, have a stake in its outcome." United States v. Aponte-Suárez, 905 F.2d 483, 491 (1st Cir. 1990) (alteration in original) (internal quotation marks omitted). Although a financial stake in the success of the conspiracy is not "essential" to establish this element, United States v. Isabel, 945 F.2d 1193, 1203 (1st Cir. 1991), we have suggested that it is not reasonable to conclude that a defendant who is "indifferent" to the conspiracy was a member of it, see Dellosantos, 649 F.3d at 122-23 & n.15.

Mr. Burgos concedes the existence of a conspiracy; he challenges, however, the Government's proof with respect to the second and third elements of the charged conspiracy. We turn first, therefore, to the element of knowledge.

19

## B.  Evidence at Trial--Knowledge

### 1.

The Government maintains that the evidence presented at trial would allow a reasonable jury to conclude beyond a reasonable doubt that Mr. Burgos had actual knowledge of, or was willfully blind to, Ramos's drug operations.  The Government points to three pieces of evidence that, it believes, taken together, create an inference of knowledge on Mr. Burgos's part.  The Government argues that,

> [g]iven Burgos's regular interaction with the Vice Squad on his assigned patrol route, which was within an area replete with drug crime, and his comments to Carlson, which suggested a familiarity with the work of the Vice Squad, a jury could reasonably have inferred that Burgos knew that the Vice Squad investigated primarily drug crime.  And given this inference, the jury could reasonably have inferred that once Burgos discovered that the Vice Squad was surveilling Ramos, Burgos knew or was willfully blind to the existence of Ramos's drug distribution activity.[44]

When we evaluate the evidence presented at trial, however, we are unable to conclude that the inferences drawn by the Government, and apparently by the jury, are supported by the evidence.  First, Mr. Burgos's "regular interaction with the Vice Squad on his assigned patrol route" did not establish Mr. Burgos's knowledge of the Vice Squad's work distribution.  Detective Smith testified that, once he was assigned to the Vice Squad, he

---

[44]  Appellee's Br. 17.

encountered Mr. Burgos "[s]everal times a week," but that a typical encounter was at "[t]he gas pumps at the Worcester Police Headquarters."[45]  Detective Carlson related that, when he was assigned to the Community Impact Division, he "would encounter [Mr. Burgos] almost on a daily basis throughout the day."[46]  Once Detective Carlson joined the Vice Squad, however, he and Mr. Burgos "didn't really work on operations together."[47]  They did "encounter each other on the street on a fairly regular basis"; Detective Carlson explained that "route officers frequently assist[ed] the vice squad with stops and arrests," and, when Vice Squad members were available, they would assist route officers with their 911 calls.[48]  Detective Carlson did not quantify how many, or what percentage, of the arrests with which Mr. Burgos assisted were drug arrests.  Nor did he further explain what percentage of their encounters on the street were incidents of Detective Carlson assisting Mr. Burgos, as opposed to vice versa.  From this evidence, a jury reasonably could infer that Mr. Burgos knew Detectives Smith and Carlson and that he also knew the types of crimes that the Vice Squad investigated.  None of this evidence suggests, however, that Mr. Burgos knew what percentage of the Vice

---

[45]  R.326 at 111, 113.

[46]  Id. at 178.

[47]  Id. at 181.

[48]  Id.

21

Squad's time and effort was devoted to drug crimes, as opposed to prostitution or gambling.

The same is true with the evidence concerning the area Mr. Burgos patrolled. The Government points to the fact that the Main South area was "an area replete with drug crime" to establish that Mr. Burgos must have known that the Vice Squad was investigating drug crimes at G & V.[49] Evidence at trial established, however, that Main South was known to be a "high crime" area and that not only drug crimes, but also prostitution and other crimes were prevalent.[50]

The Government also believes that Mr. Burgos's comments to Detective Carlson when he was promoted to the Vice Squad support the inference that Mr. Burgos knew that the Vice Squad dedicated nearly all of its time to drug investigations. Mr. Burgos's vague laudatory statements congratulating two co-workers on their promotions--"you and Kellen, you guys do a good job up there,"[51]-- suggest some familiarity with the Vice Squad, but hardly suggests that he was familiar with the distribution of the Vice Squad's workload.

Viewing this evidence in the light most favorable to the Government, a reasonable jury could conclude, beyond a reasonable

---

[49]  Appellee's Br. 17.

[50]  R.326 at 60, 153.

[51]  Id. at 179.

22

doubt, that Mr. Burgos knew that Main South was an area of high crime, and specifically high drug crime, that the Vice Squad investigated crimes involving drugs, prostitution and gaming, and that the Vice Squad was surveilling G & V. From this, a jury certainly could infer that Mr. Burgos was aware that the Vice Squad was investigating G & V for possible criminal activity that fell within its purview--drug crimes, prostitution or gaming. None of the evidence, however, establishes, beyond a reasonable doubt, that the Vice Squad was investigating a drug crime, as opposed to prostitution or gaming. As we have stated previously, "[i]f the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," this court must reverse the conviction. Flores-Rivera, 56 F.3d at 323 (alteration in original) (internal quotation marks omitted). Without evidence that pointed to the likelihood that the Vice Squad was investigating drug crimes, the jury's verdict cannot be sustained.

### 2.

The Government next asserts that jury reasonably could infer that Mr. Burgos, as an experienced police officer who patrolled a high crime area, "was familiar with indicia of drug

23

dealing."[52]  The Government further contends that, "[g]iven that surveillance officers observed drug-related activity occurring at G & V, . . . the jury could reasonably have drawn the further inference that Burgos knew about or willfully blinded himself to the robust drug trafficking operation that Ramos was running there."[53]

The Government, however, neither identifies what these "indicia of drug dealing" might be, nor points to any evidence of such indicia in the record.  Turning to the drug-related activity at G & V that was <u>observed by</u> surveillance officers, the brief mentions only one instance:  "Ramos walking around in front of G & V, apparently engaged in counter-surveillance."[54]  Mr. Burgos, the Government continues, was on patrol in the area on the day that surveillance officers observed this behavior.  Notably, however, the Government does not point to any testimony that Mr. Burgos passed by G & V in his patrol car while Ramos was engaging in this activity, much less that Mr. Burgos saw Ramos or made any contact with him.  The Government points to no other drug-related activity that was seen by surveillance officers that also was seen by Mr. Burgos.  Because the record does not establish that Mr. Burgos observed any drug-related activity at G & V, his observations

---

[52] Appellee's Br. 19.

[53] <u>Id.</u>

[54] <u>Id.</u> at 18 (citing R.326 at 110-13).

24

cannot be a basis for establishing his knowledge or willful blindness to such activity.

### 3.

The Government asserts that, based upon "the nature and frequency of Burgos's and Ramos's interactions, as well as Burgos's police work in an area rife with drug activity, Burgos at the very least knew or willfully blinded himself to Ramos's daily cocaine and Percocet use."[55] The evidence establishes that, once Mr. Burgos's brother-in-law left G & V sometime before April 2006, Mr. Burgos visited G & V with less frequency. Ramos estimated that Mr. Burgos brought his car in "[n]ot often, once a year, or once a month depending on what it was";[56] he stated later in his testimony that he thought Mr. Burgos came in "[a]bout three times" after his brother-in-law left G & V.[57] The Government does not point to any other evidence that suggests that Mr. Burgos's visits were more frequent. Moreover, there is no evidence in the record to suggest that Mr. Burgos and Ramos interacted socially with one another. The record similarly is devoid of any testimony concerning the physical characteristics of regular cocaine or Percocet users and whether Ramos displayed any of those characteristics.

---

[55] Appellee's Br. 20 (citations omitted).

[56] R.327 at 106.

[57] Id.

25

Consequently, contrary to the Government's assertion, this is not the type of "close relationship" that "can, as part of a larger package of proof, assist in supporting an inference of involvement in illicit activity." Ortiz, 966 F.2d at 713 (involving a defendant who was brother-in-law to another conspirator); United States v. DiMarzo, 80 F.3d 656, 661 (1st Cir. 1996) (holding that, "[t]ogether with the incriminating circumstantial evidence," the fact that the defendant, "'the lookout,'" was brother to the "'pointman'" "permitted a rational jury inference that [the defendant] well knew he was involved in a drug deal").[58]

---

[58] In a footnote, the Government argues that other aspects of Ramos's testimony, namely his informing "everyone that [he] had the protection of a police officer," id. at 124, support the inference that Mr. Burgos was the officer in Ramos's pocket and that Mr. Burgos knew of the drug conspiracy. It acknowledges that Ramos also testified that, when he made the statements that he had an officer "under [his] wing," he merely was engaging in braggadocio. R.328-1 at 33. The Government argues, however, that the jury was free to disregard this latter testimony. See Appellee's Br. 21 n.11. Although we agree with the general proposition that "a jury has the prerogative to credit some parts of a witness's testimony and disregard other potentially contradictory portions," United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000), the Government explicitly credited Ramos's testimony--that he did not have Mr. Burgos under his wing--in its closing argument to the jury:

> And it's also true that Ramos didn't have Burgos under his wing or under his thumb. The prosecution doesn't have to prove that in order to prove Burgos's guilty of the crime of conspiracy. The prosecution only has to prove that Burgos willfully joined a marijuana conspiracy. Burgos didn't need to be under Ramos's wing or under his thumb in order to have joined the conspiracy.

R.329 at 47-48 (emphasis added). Consequently, having made the
(continued...)

**4.**

The Government next argues that, based on Ramos's questions to Mr. Burgos about police surveillance, it is reasonable to conclude that Mr. Burgos knew of, or was willfully blind to, Ramos's drug distribution efforts. The Government invites the court's attention to two pieces of evidence. First, in late 2008, Ramos noticed that an individual who worked with the "Gang unit" was watching the garage through binoculars.[59] When Ramos told Mr. Burgos about seeing the officer, Mr. Burgos "told [him] that it could be that the place was hot."[60] Ramos understood "hot" to mean that the garage was being watched; he told Mr. Burgos, "I'll be careful."[61] Second, on January 14, 2009, Ramos asked Mr. Burgos about the white, red and green vehicles that he had noticed following him. The relevant conversation was captured by a wiretap, and the transcript reads as follows:

> BURGOS:  [Aside . . . hold on, no . . .] Hello!
>
> RAMOS:   Tell me, Carlos.
>
> BURGOS:  How are you? What's up?

---

[58] (...continued)
argument to the jury that Ramos's testimony was true, we do not believe it should now be heard to suggest that the jury was free to discount that testimony.

[59]  R.327 at 114.

[60]  Id. at 115.

[61]  Id. at 116.

27

RAMOS: Tell me, did you find out about that for me, or not?

BURGOS: Uh . . . yes, but no . . . I don't know if for there . . . there were two. Uh . . . the white one and the red one.

RAMOS: Yes, but I saw that one already, there's the white one and a green van, too.

BURGOS: [Unintelligible].

RAMOS: A green one. Did you hear?

BURGOS: But I don't know if it is for over there, but, uh . . . they're down there, yes.

RAMOS: I know they're down here.

BURGOS: Yes, so let's take it easy for now.

RAMOS: Yes, I know, I know, I know . . . that's why I told you that. I know.

BURGOS: Yes, yes, yes . . .

RAMOS: Okay.

BURGOS: Okay?

RAMOS: Okay.

BURGOS: Okay. Bye.[62]

The Government asserts that this conversation supports the conclusion that Mr. Burgos knew of, or was willfully blind to, Ramos's distribution of drugs. Again, these conversations may indicate that Mr. Burgos was aware of, or willfully blind to, some criminal behavior on behalf of Ramos; however, they do not

---

[62] Id. at 130-31.

establish any knowledge or red flags with respect to <u>drug activity</u>.[63]

**5.**

To this point, we have addressed the probative value of individual pieces of evidence introduced by the Government. It is, however, "the cumulative probability of guilt created by all the evidence, rather than the probability of guilt created by a single piece of evidence, that is the touchstone in deciding whether a reasonable jury could find the defendant guilty beyond a reasonable doubt." <u>United States</u> v. <u>Williams</u>, 698 F.3d 374, 379 (7th Cir. 2012). We find that in evaluating the evidence as a whole, however, we must stack inference upon inference in such a way as to make the conclusion that Mr. Burgos had knowledge of, or was willfully blind to, Ramos's drug distribution too speculative to sustain Mr. Burgos's conviction. These inferences include: (1) that, by virtue of his experience as a police officer and his work in the Main South area, Mr. Burgos knew the workload distribution of the Vice Squad, (2) that, given his friendship with Ramos,

---

[63] Tellingly, Ramos was asked on direct examination what he understood Mr. Burgos to have meant by "Yes, so let's take it easy for now." <u>Id.</u> at 132. He responded by saying that he understood Mr. Burgos to have meant "[t]hat I had to take it easy <u>if I was doing something</u> against the law." <u>Id.</u> at 133 (emphasis added). In other words, Ramos understood Mr. Burgos to be offering advice against the possibility that Ramos was involved in "something" illegal.

Mr. Burgos must have known about Ramos's drug use and, therefore, further should have suspected his drug dealing, (3) that, by virtue of his patrolling the Main South area, he must have seen indicia of drug activity at G & V and (4) that, because Ramos asked if he was being watched, and Mr. Burgos confirmed that surveillance officers were in the area and stated "let's take it easy for now," Mr. Burgos must have been privy to Ramos's drug distribution activities. As we concluded in DeLutis, "[t]he piling of these unfounded and unsupported inferences on top of each other by the government is clearly contrary" to our own case law and that of the Supreme Court. 722 F.2d at 907.

Indeed, we perceive little to distinguish the type of evidence at issue here from that in Pérez-Meléndez, which we concluded was insufficient to sustain the conviction for aiding and abetting possession with intent to distribute cocaine. In Pérez-Meléndez, based on an anonymous tip, DEA agents approached a truck driven by Pérez-Meléndez and, after securing Pérez-Meléndez's consent to search the vehicle, discovered forty kilograms of cocaine hidden in pallets containing reams of paper. 599 F.3d at 34. In his statement to the agents, Pérez-Meléndez stated that he was an independent truck driver, who had received a telephone call from co-defendant Rivera-Ríos that morning to determine if Pérez-Meléndez could work as a truck driver that day. Id. at 35. Pérez-Meléndez's statement was not consistent with respect to (1)

30

who had rented the truck, (2) who (he or Rivera-Ríos) had received the calls from the individual giving delivery instructions and (3) the extent to which he and Rivera-Ríos had worked together in the past. Id. at 35-36. Although acknowledging that much of the transaction was suspicious, we nevertheless concluded that the Government had not met its burden of establishing the elements of aiding and abetting possession with intent to distribute narcotics:

> Some of the inferences the district court draws are certainly plausible, but their significance is limited. A rational factfinder could have drawn a plausible inference that appellants knew they were involved in an illegal activity because appellants' statements and omissions concerning their job and the manner in which they were hired for and performed that work earlier the same day are suspicious. However, we find that a rational factfinder could not have concluded beyond a reasonable doubt that appellants committed the charged crime because reasonable doubt should have remained that (1) appellants knew that the precise nature of that activity involved controlled substances generally or cocaine specifically and (2) appellants were aware of a high probability that illegal drugs were packaged within the pallets and consciously and deliberately avoided learning of that fact.

> . . . .

> . . . Any conclusion by the jury beyond that, specifically imputing to appellants knowledge of or willful blindness to the contents of the pallets, was the product of pure speculation. This is particularly true when one considers that the burden is proof beyond a reasonable doubt.

> The evidence the government presented in this case would have been just as consistent with that of a case involving the smuggling of contraband other than a controlled substance. This contraband could plausibly have been other goods, such as

31

weapons, stolen jewels or computer chips, counterfeit currency, diamonds and other precious minerals from Africa, cigars from Cuba, fuel, or child pornography. Here the government presented no evidence at trial that could have led a reasonable jury to find beyond a reasonable doubt that (1) appellants knew whatever contraband may have been present involved a controlled substance or (2) appellants were aware of a high probability that illegal drugs were packaged within the pallets and consciously and deliberately avoided learning of that fact.

Id. at 43-46 (citations omitted).

We believe the same result obtains here. The combination of both the Gang Unit and the Vice Squad surveilling G & V, Ramos's ability to secure items at well-below retail cost for resale to Mr. Burgos, and Ramos's inquiries, on two occasions, concerning surveillance, were warning signs that something illegal was afoot at G & V. There simply is no evidence, however, that Mr. Burgos knew, or was aware of a high probability, that the illegal actions involved drugs.

On the evidence before us, we cannot say that a rational jury could have concluded, beyond a reasonable doubt, that Mr. Burgos had knowledge of, or was willfully blind to, the marijuana distribution operation being run by Ramos out of G & V. Consequently, the Government did not meet its burden of proof with respect to the second element of the charged conspiracy, and Mr. Burgos's conviction on that charge must be vacated.[64]

_____

[64] Because Mr. Burgos prevailed on his sufficiency of the
(continued...)

## Conclusion

For the reasons set forth above, the judgment of the district court is reversed, and the case is remanded with instructions to enter a judgment of acquittal.

**REVERSED and REMANDED**

---

[64](...continued)
evidence argument concerning the second element of conspiracy, we do not reach the issue of the sufficiency of the evidence with respect to the third element of conspiracy--Mr. Burgos's willing participation therein--nor do we address any instructional error.