# United States Court of Appeals
## For the First Circuit

Nos. 13-2098, 13-2101

UNITED STATES OF AMERICA,

Appellee,

v.

ANGEL PAZ-ALVAREZ and LUIS MARRERO-MARRERO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Selya, Circuit Judge,
Souter,* Associate Justice, and
Lipez, Circuit Judge.

Raymond Rivera Esteves for appellant Paz-Alvarez.
Javier A. Morales-Ramos for appellant Marrero-Marrero.
Juan Carlos Reyes-Ramos, Assistant United States Attorney,
with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

August 21, 2015

---

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**LIPEZ**, <u>Circuit Judge</u>.    Appellants Angel Paz-Alvarez ("Paz") and Luis Marrero-Marrero ("Marrero") were convicted for their roles in a drug trafficking conspiracy.  Together, they built sophisticated secret compartments ("clavos") in boats designed to smuggle hundreds of kilograms of cocaine into the United States. They argue that their convictions should be vacated because of errors in the jury instructions.  In addition, Paz challenges the sufficiency of the evidence and the two-level sentence enhancement he received for using a "special skill," while Marrero argues that the conspiracy statutes are unconstitutional as applied to him, that the admission of hearsay evidence gave rise to a prejudicial variance, and that there was cumulative error.  Finding no errors and the evidence sufficient, we affirm.

## I. Background

**A.  Facts**

Since one of the claims addressed in this opinion is a challenge to the sufficiency of the evidence, we recount the facts in the light most favorable to the verdict.  See <u>United States</u> v. <u>Rodríguez-Soler</u>, 773 F.3d 289, 290 (1st Cir. 2014).[1]  In 2009, Nick Irizarry-Rosado ("Irizarry") and Edwin Retamar-Oriol ("Retamar") went into business together smuggling cocaine into Puerto Rico.

---

[1] Paz challenges the sufficiency of the evidence.  We do not think that Marrero is prejudiced by the application of this standard because the substantive argument for one of his claims is, in essence, a sufficiency challenge.  See footnote 16, <u>infra</u>.

They had met while in the mutual employ of a Puerto Rico drug trafficker, but Irizarry and Retamar had grown dissatisfied with their employer's way of doing business. Using one of their former employer's boats and Irizarry's contacts in the Dominican Republic, they embarked on an independent venture and successfully smuggled twenty kilograms of cocaine into Puerto Rico.

With the profits from their first solo smuggling job, they purchased a vessel of their own, the Sheymarie. They quickly put the Sheymarie to use, successfully smuggling another 100 kilograms of cocaine into Puerto Rico. Encouraged by the success of that undertaking, their contacts in the Dominican Republic then proposed smuggling a larger quantity of cocaine, specifically, 500 kilograms. Irizarry and Retamar agreed that they would take on the larger load and, to accomplish the task, purchased a second vessel, the Such Is Life.

Problematically, the Such Is Life was not already outfitted with a clavo large enough to smuggle 500 kilograms of cocaine. Consequently, Irizarry and Retamar asked drug dealers with whom they were in contact to recommend individuals with the skills necessary to build hidden compartments in their boat. Paz and his assistant, Marrero, came highly recommended. They had built "several" clavos in the past for the drug dealers Irizarry and Retamar consulted and had reportedly done "a good job."

After Paz and Marrero were assured that Irizarry and Retamar could be trusted, Paz, Marrero, and a third clavo builder, Jonathan Delgado-Flores ("Delgado"), met with Irizarry and Retamar in Puerto Rico. At the meeting, Irizarry and Retamar told the clavo builders that they needed a secret compartment built in the Such Is Life large enough to hold 500 kilograms of cocaine. Paz promised that "it would be done." Paz, Marrero, Irizarry, and Retamar then met several more times to plan the clavo.

In September 2009, Irizarry, Retamar, Paz, Marrero, and Delgado met inside the Such Is Life to discuss the completed clavo's operation. A sixth individual was also present at that meeting: Ramon Alvarado-Ignacio, who went by the moniker "Moncho" and administered the marina where the Such Is Life was harbored. Moncho was secretly a government informant, wired to record the meeting. Paz, however, was suspicious of Moncho and refused to discuss the clavo's operation in front of him. Moncho left the room, leaving the door open, and Paz instructed another person in the room to close the door so Moncho could not hear how to operate the secret compartment. Several minutes later, when that portion of the conversation was concluded, Moncho was permitted to reenter.

At the close of the meeting, Retamar told Paz that they needed a clavo built in their other boat, the Sheymarie. Soon, Paz and Marrero were at work on two secret compartments in that vessel: they enlarged an existing clavo and built a second one.

Within a month, however, law enforcement officials detected controlled substances onboard the Sheymarie and seized her.

On November 10, 2009, Irizarry, Retamar, Paz, and Marrero again met in Puerto Rico, this time to discuss building an additional compartment in the Such Is Life. A second compartment was needed because 500 kilograms of cocaine would not comfortably fit in the first clavo.[2]

Two days later, Retamar, Paz, Marrero, and others met in Puerto Rico to discuss the new clavo. They also discussed the upcoming trip, which was being coordinated with the Dominican contacts, to smuggle 500 kilograms of cocaine from Venezuela into Puerto Rico by way of a rendezvous point on the open sea near St. Croix. Retamar invited Paz, Marrero, and Delgado to join him on the voyage, and Marrero and Delgado agreed to go. Later, however, Marrero changed his mind; hence, neither he nor Paz accompanied Retamar on the drug-smuggling excursion. In December 2009, with the new clavo completed, Delgado and Retamar took the Such Is Life

---

[2] The first clavo had been built in a space that had a small motor and two rods that held the propellers. After "reinvestigat[ing]" that site, Retamar and his cohorts "found out it was too uncomfortable to do it [i.e, to store the cocaine] there. And we changed it." In other words, since putting the cocaine in the first clavo was "too difficult," the first clavo was "cancelled" (Paz contends this means "dismantled") and a second clavo was constructed elsewhere on the boat. Trial Tr. Day 2 at 95-99, May 9, 2013.

to the rendezvous point.[3]  The mission was unsuccessful, though, because the supplier never arrived.

At some point after that, Irizarry and Retamar parted ways.  Retamar launched an independent operation using a new vessel.  However, federal authorities soon arrested Retamar, seizing his new boat and the drugs onboard.  Retamar then began cooperating with the authorities.

Under the direction of federal agents, Retamar reached out to Irizarry, ostensibly to resume business together.  Retamar was actually helping to set up a sting operation: a voyage on which Irizarry and other conspirators would be caught smuggling drugs.  As planned, Irizarry took the Such Is Life on a drug-smuggling mission and loaded it with cocaine.  On its way back to Puerto Rico, however, the Such Is Life encountered mechanical trouble and stalled in the water.  Federal agents rushed in, seizing the boat.

Agents from U.S. Customs and Border Protection, including Agent Rafael Reyes ("Reyes"), searched the Such Is Life for contraband.  Reyes had ten years of experience on the anti-smuggling team, but he nevertheless struggled to find the sophisticated clavos that Paz and Marrero had constructed.  Reyes and his team ultimately uncovered the clavos and found 150 kilograms of cocaine within.

---

[3] Delgado's job was to operate the complicated mechanism for opening and closing the clavo.

**B. Procedure**

In September 2012, a grand jury returned an indictment charging the appellants and nine others with: one count of conspiring to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(ii); and one count of conspiring to import a controlled substance, in violation of 21 U.S.C. §§ 963, 952, 960(a)(1), and 960(b)(1)(B).[4]

Paz and Marrero were tried together.[5] The government's case relied heavily on cooperating witness Retamar, whose testimony comprised most of the first two days of the three-day trial. The jury returned a verdict of guilty on both counts as to both Paz and Marrero. On the same verdict sheet, the jury was asked whether "more than 5kg of cocaine" or "less than 5kg of cocaine" were involved in the conspiracy. The jury found that "more than 5kg of cocaine" were involved.

At sentencing, the district court determined that Paz's base offense level ("BOL") under the Sentencing Guidelines was 38 because, by a preponderance of the evidence, over 150 kilograms of

---

[4] Despite the two counts, we will follow the parties' lead and refer to "the conspiracy," singular.

[5] Delgado pleaded guilty to the importation count and, on the government's motion, the distribution count was dismissed. The district court sentenced Delgado to 135 months' imprisonment and we upheld the sentence. See United States v. Delgado-Flores, 777 F.3d 529 (1st Cir. 2015).

cocaine were involved in the conspiracy. Two levels were added to the BOL because Paz used a special skill, resulting in a total offense level of 40, with a corresponding Guidelines range of 292 to 365 months. The court sentenced Paz to 292 months' imprisonment.

The court also set Marrero's BOL at 38 based on its finding that the conspiracy involved more than 150 kilograms of cocaine. The court then reduced his BOL to 28 for, among other factors, minimal participation, yielding a Guidelines range of 78 to 97 months' imprisonment. However, the jury's finding that more than five kilograms of cocaine were involved in the conspiracy triggered a 120-month statutory minimum sentence. Hence, Marrero was sentenced to 120 months' imprisonment.

Paz and Marrero each appeal their sentences and convictions on multiple grounds, some overlapping.

## II. Joint Issues

Appellants make two challenges to the jury instructions. First, they contend that the court did not properly charge the jury with the mens rea required for conspiracy. Second, they argue that the court did not properly instruct the jury to apply the reasonable doubt standard to its finding that more than five kilograms of cocaine were involved in the conspiracy.

## A.  The Intent Instruction

To support a conviction for conspiracy, the evidence must show (1) the existence of a conspiracy, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's knowing and voluntary participation in the conspiracy.  United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011).  "Under the third element, the evidence must establish that the defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy."  Id.

The court instructed the jury on the third element of conspiracy as follows: "Here the allegation is that Mr. Paz and Mr. Marrero joined the conspiracy knowingly and willfully . . . . Acting knowingly and willfully, I already told you, means to do something that the law forbids.  It means to act voluntarily and intelligently, and with a specific intent that the conspiracy be successful."[6]

---

[6] In full, the relevant instructions were:

> Here the allegation is that Mr. Paz and Mr. Marrero joined the conspiracy knowingly and willfully . . . .  Acting knowingly and willfully, I already told you, means to do something that the law forbids.  It means to act voluntarily and intelligently, and with a specific intent that the conspiracy be successful.  That is to say, with a bad purpose to disobey or disregard the law, and not because of mistake, accident, or other innocent reason.

- 9 -

Paz and Marrero argue that the court did not adequately instruct the jury that the requisite intent for conspiracy is two-pronged, i.e., that a defendant must both intend to join the conspiracy and intend that the conspiracy achieve its aim. United States v. Gonzalez, 570 F.3d 16, 24 (1st Cir. 2009). Consequently, they argue, the court's instructions allowed the jury to convict them merely because they knew about the conspiracy.[7] They admit that they knew the conspiracy would use their clavos to smuggle drugs, but insist that they were indifferent to the conspiracy's success and, hence, did not join it. See United States v. Burgos,

Proof that a defendant willfully joined in the agreement must be based upon the evidence of his own words and/or actions. . . .

Even if the defendant was not part of the agreement at the very start, the defendant can be found guilty of the conspiracy if the Government proves that the defendant willfully joined the agreement.

On the other hand, a person who has no knowledge of a conspiracy, but simply happens to act in a way that furthers some object of the conspiracy, does not thereby become a conspirator. The crime of conspiracy is complete upon the agreement to participate in such a way in which you take steps to make the criminal venture happen, succeed.

[7] Marrero suggests, though does not meaningfully argue, that the court's failure to properly charge the jury with the full intent requirement constituted structural error. However, "a jury instruction that omits an element of the offense" is not structural error. Neder v. United States, 527 U.S. 1, 8 (1999).

- 10 -

703 F.3d 1, 11 (1st Cir. 2012) ("[W]e have suggested that it is not reasonable to conclude that a defendant who is 'indifferent' to the conspiracy was a member of it."). Below, they sought to add language to the instructions that would have made the two-pronged nature of the requisite intent more explicit, but the district court declined to add the language they proposed.[8]

Our review of a court's refusal to give a requested instruction is de novo. United States v. Baird, 712 F.3d 623, 628 (1st Cir. 2013). When, as here, the evidence is sufficient to support a requested instruction, our review proceeds in three steps: "We will reverse a district court's decision . . . only if the [requested] instruction was (1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense." Id. Paz and Marrero's challenge turns on the second step, whether the requested

---

[8] At trial, the defendants offered language from the Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.18.371(1) (updated Apr. 21, 2015) and from Burgos, 703 F.3d at 11. In addition, during an in-chambers conference, Paz sought a "negative Direct Sales instruction," which would have explained that a defendant's knowledge that his goods or services will be used for an illegal purpose is not enough to prove that he intended to join the conspiracy. See United States v. Brandon, 17 F.3d 409, 449 (1st Cir. 1994); Direct Sales Co. v. United States, 319 U.S. 703, 712 (1943).

instruction was substantially covered.  The district court has broad discretion to determine "the precise manner that it explains legal concepts to the jury."  United States v. McFarlane, 491 F.3d 53, 59 (1st Cir. 2007).  The court need not accept verbatim the parties' preferred language.  Id.

Here, the instruction explicitly stated the requirement that the defendants join the venture "knowingly and willfully," and that a finding of guilt depends on whether they acted "with a specific intent that the conspiracy be successful."  The court further instructed, "Even if the defendant was not part of the agreement at the very start, the defendant can be found guilty of the conspiracy if the Government proves that the defendant willfully joined the agreement."  The court's emphasis on willfully joining the conspiracy with the intent that it be successful was sufficient to convey the intent requirement to the jury.  See Gonzales, 570 F.3d at 24 (equating the two-pronged intent requirement with an instruction that a defendant "willfully" join the conspiracy).  Although the instructions might have been clearer if the court had adopted the language that the defendants proposed, we conclude that the instructions as rendered substantially covered the dual intents required for a conspiracy conviction and did not allow the jury to convict the defendants based solely on their knowledge that the secret compartments they built would be used for illegal purposes.

## B. The Drug Quantity Instruction

The district court based its sentences on the jury's finding that more than five kilograms of cocaine were involved in the conspiracy. Consequently, the court sentenced Paz and Marrero under 21 U.S.C. § 841(b)(1)(A), which mandates a sentence of ten years to life when five kilograms or more of cocaine are involved in the conspiracy. Other than the fact of a prior conviction, any fact that increases the mandatory minimum or maximum sentence must be submitted to a jury and proved beyond a reasonable doubt. Alleyne v. United States, 133. S. Ct. 2151, 2155 (2013) (minimum); Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (maximum). Paz and Marrero argue that the district court failed to instruct the jury that the drug amount had to be found "beyond a reasonable doubt." Therefore, they assert, there was no proper finding on drug quantity, and they should have been sentenced under 21 U.S.C. § 841(b)(1)(C), which provides a sentencing range of zero to twenty years when drug quantity is not determined. We conclude there was no error in the court's instructions as rendered.[9]

Here, the court began its instructions with a full explanation of the reasonable doubt standard, the government's

---

[9] Although Marrero concedes our review of this issue is for plain error, Paz contends the issue was preserved below because a relevant requested jury instruction was discussed and rejected in the trial judge's chambers. The defendants' claim fails under any standard of review.

burden to prove guilt beyond a reasonable doubt, and a defendant's right to rely on the government's failure "to establish beyond a reasonable doubt any element of a crime charged against him." Later in its instructions, the court discussed the indictment, which charged the defendants with participating in a conspiracy involving more than five kilograms of cocaine. The court did not specifically refer to drug quantity at that point, but explained that the indictment "is simply an accusation" and that "the [g]overnment has to prove the defendants' guilt beyond a reasonable doubt." Then, explaining the elements of conspiracy, the court reiterated, "the [g]overnment must prove beyond a reasonable doubt that those involved shared a general understanding about the crime." Continuing to discuss the elements of conspiracy, the court stated: "You need not find that a defendant agreed specifically to or knew about all the details of the crime . . . . But the [g]overnment must prove beyond a reasonable doubt that the defendant knew the essential features and general aims of the criminal venture."

With the elements of conspiracy explained, the court then discussed jury deliberation procedures: selection of a foreperson, the requirement that the verdict be unanimous, each juror's duty to decide the matter for him- or herself, and the need to examine and reexamine one's position while maintaining

one's honest convictions.  The court then discussed the verdict
form:

> The verdict form that you will use is
> this one that I have prepared.  Very simple
> form.  It talks about Count I and Count II,
> and simply asks you whether you find Mr. Paz
> and Mr. Marrero guilty or not guilty as
> charged.
>
> I am also asking you another question.
> How much cocaine is involved in this
> conspiracy?  That's the question, and the
> answer must be one of these two.  More than
> five kilos of cocaine, or less than five kilos
> of cocaine.  I don't want you to give me a
> specific.  I just want you to tell me whether
> it's more than five or less than five.  That's
> all.

According to Paz and Marrero, the district court's error
was twofold: first, it did not include drug quantity in its
discussion of the elements of conspiracy, and, second, it did not
reiterate the reasonable doubt standard in its discussion of the
verdict form, when the court asked the jury to determine drug
quantity.  This approach, they contend, permitted the jury to find
drug quantity by a less stringent standard, thus violating their
Fifth Amendment right to Due Process and their Sixth Amendment
right to a jury verdict governed by the reasonable doubt standard.[10]

---

[10] See Sullivan v. Louisiana, 508 U.S. 275, 278 (1993) ("It
is self-evident, we think, that the Fifth Amendment requirement of
proof beyond a reasonable doubt and the Sixth Amendment requirement
of a jury verdict are interrelated.").

We review the instructions as a whole, not piecemeal. United States v. Melendez, 775 F.3d 50, 55 (1st Cir. 2014); Gonzalez, 570 F.3d at 21. Assessing whether the jury was properly charged with the reasonable doubt standard, "the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it." Victor v. Nebraska, 511 U.S. 1, 6 (1994).

We acknowledge that the instructions might have been better if the court had discussed drug quantity alongside the other elements of the crime, or if the court had reiterated the reasonable doubt standard when it instructed the jury to make a finding on drug quantity. Nevertheless, the court repeatedly emphasized the reasonable doubt standard throughout the instructions. The drug quantity determination was then grouped together with the court's explanation that the jury would be asked to determine whether the defendants were guilty of conspiracy, a determination that the instructions made unequivocally subject to the reasonable doubt standard. Furthermore, the jury had a copy of the indictment during its deliberations, and the court emphasized that the accusations in the indictment, which included an accusation that the conspiracy involved more than five kilograms, had to be proved beyond a reasonable doubt. Hence, we do not think that there is "a reasonable likelihood that the jury

understood the instructions to allow conviction" without proof beyond a reasonable doubt of every element of the charged offense, including drug quantity.

Contrary to Paz and Marrero's assertion, this case is distinguishable from United States v. Delgado-Marrero, 744 F.3d 167 (1st Cir. 2014). In Delgado, the court instructed the jury on the elements of conspiracy, but did not ask the jury to make a finding as to the quantity of drugs involved. Id. at 183. After the jury deliberated and returned a guilty verdict, the court sent the jury back for a second deliberation to determine drug quantity, stating, "It's like another deliberation under the same terms and conditions." Id. On appeal, the government argued that the district court's "same terms and conditions" instruction was sufficient to convey to the jury that the reasonable doubt standard still applied. Id. at 187. However, in large measure because the jury had already returned a verdict before being asked to deliberate a second time, we held that instructional error had occurred. "[G]iven the timing and manner in which the question was presented, the jurors understandably may have failed to appreciate that the additional question represented something more than an inconsequential afterthought . . . ." Id.

The facts here differ significantly from those in Delgado. The finding on drug quantity was made as part of the original deliberations, not following an initial verdict during

resumed deliberations. Drug quantity was also included on the same verdict form as that used to determine the defendants' guilt or innocence on the substantive charges. We do not think "there is a reasonable likelihood," Victor, 511 U.S. at 6, that a juror in this case would have understood the instructions to permit the application of anything other than the reasonable doubt standard to the assessment of drug quantity. Therefore, the court did not fail to charge the jury with the reasonable doubt standard on an element that increased the mandatory minimum or maximum sentences.

### III. Paz's Claims

Paz argues that the evidence was insufficient to support his conviction and that the district court erroneously increased his BOL by two levels for use of a "special skill."

### A. Sufficiency of the Evidence

Our review of the sufficiency of the evidence is de novo. United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015). We view the evidence in the light most favorable to the verdict, giving "equal weight to direct and circumstantial evidence." United States v. Appolon, 715 F.3d 362, 367 (1st Cir. 2013). Importantly, the relevant inquiry is not whether a reasonable jury could have acquitted the defendant, but rather whether a reasonable jury "could have found that the government proved each element of the crime beyond a reasonable doubt." Id. (internal quotation marks omitted).

As we explained above, to convict Paz of conspiracy, the jury had to find beyond a reasonable doubt that "(1) a conspiracy existed, (2) the defendant had knowledge of the conspiracy, and (3) the defendant knowingly and voluntarily participated in the conspiracy." Dellosantos, 649 F.3d at 116. Paz does not dispute that a conspiracy existed and that he had knowledge of it. His challenge to the sufficiency of the evidence is limited to the third element, under which the government had to prove that he intended to join the conspiracy and that he intended for its goals to be accomplished. See id. Paz advances the notion that he was indifferent to the conspiracy and lacked the requisite intent. He contends that he was simply "contracted" to perform "work orders" for clavo-related "services." He emphasizes that his services amounted to only seven to nine workdays scattered across several months, after which he was "never . . . seen or heard from again."

There are many ways to show that a defendant intended to join and advance a conspiracy, even where the defendant never actually handled the drugs. The defendant's intention to join "need not be express, but may be shown by circumstantial evidence." United States v. Portalla, 496 F.3d 23, 26 (1st Cir. 2007). Hence, "acts that furthered the conspiracy's purposes" may be evidence of the intent to join. United States v. McDonough, 727 F.3d 143, 156 (1st Cir. 2013). The requisite intent may also be shown through the knowing provision of peripheral services that aid in one of a

- 19 -

conspiracy's objectives, like the objective to avoid police detection.  Portalla, 496 F.3d at 27.  Ancillary functions like accounting, communications, and strong-arm enforcement are all examples of peripheral services that, when performed in the service of drug dealers, can support a conspiracy conviction.  United States v. García-Torres, 280 F.3d 1, 4 (1st Cir. 2002).

Despite the arguably ancillary nature of the services Paz provided, a reasonable jury could have concluded that Paz's actions conveyed his intention to join and advance the conspiracy.[11]  He participated in planning meetings where the intended use of his clavos -- drug smuggling -- was made explicit. He then constructed multiple clavos on two vessels designed for the specific purpose of storing and secreting cocaine.  On these facts, a jury could reasonably conclude that Paz intended his ingenious compartments to achieve their aim, namely, that they conceal hundreds of kilograms of cocaine being smuggled into Puerto Rico for distribution.  In addition, Paz guarded against sharing

---

[11] Paz's invocation of United States v. Moreland, 703 F.3d 976, 984 (7th Cir. 2012), is unpersuasive.  In Moreland, the Seventh Circuit distinguished between co-conspirators and aiders and abettors, writing, "[K]nowledge of a buyer's intention to commit a crime with a supplier's goods doesn't imply an agreement between the buyer and the seller that the buyer do so.  That knowledge, coupled with [supplying the goods,] could make him an aider and abettor of the buyer's crime but not, without more, a conspirator with the buyer."  Id.  Paz fails to acknowledge that the something "more" required for a conspiracy conviction -- the intent to join the conspiracy -- may be found circumstantially, "by words or action."  García-Torres, 280 F.3d at 4.

secretive information with someone he thought untrustworthy: Moncho. That fact would further support a reasonable jury's finding that Paz wanted his work to advance the conspiracy's objective of avoiding police detection. No more was required for a reasonable jury to find that Paz in fact intended to join the conspiracy and advance its goals.

Paz argues that it is unreasonable to conclude that he was a member of the conspiracy because members of the conspiracy did not consider him to be a member. He points, inter alia, to evidence in the record that Retamar instructed Moncho not to speak with Paz over the telephone. However, as the government notes, "the jury could have reasonably construed Retamar's testimony as showing his concern that police may have tapped Paz's telephone, unbeknownst to the latter." In addition, based on the fact that Retamar invited Paz to join him on the conspiracy's largest drug-smuggling excursion -- the voyage to St. Croix to import 500 kilograms of cocaine -- a reasonable jury could conclude that members of the conspiracy trusted Paz and considered him to be one of their own.

Finally, Paz emphasizes that he declined Retamar's invitation to participate in the voyage to pick up 500 kilograms of cocaine near St. Croix and was "never . . . seen or heard from

again" after declining that invitation.[12]  A conspirator need not know "all of the details of the conspiracy or participate[ ] in every act in furtherance of the conspiracy."  United States v. Sanchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2008) (internal quotation marks omitted).  Furthermore, an "inactive co-conspirator is presumed to be a continuing member of an ongoing conspiracy" unless he withdraws.[13]  United States v. Ngige, 780 F.3d 497, 503 (1st Cir. 2015) (internal quotation marks omitted).  Here, Paz essentially argues that, because his active participation came to an end, he never joined the conspiracy at all.  But neither the fact that he declined to participate in one of the more dangerous aspects of the conspiracy (the drug run), nor the fact that his active involvement ended once he had completed the work he agreed to do, precludes a reasonable jury from finding that he joined the conspiracy when he built the clavos with the requisite knowledge and intent.

---

[12] Relatedly, Paz insists it is unreasonable to find that he joined the conspiracy solely on the basis of his association with Delgado, the clavo-maker who joined Retamar on the drug-smuggling excursion.  Of course, Paz is correct that mere association with a conspirator is not sufficient to prove beyond a reasonable doubt that a defendant is also a co-conspirator.  See Gonzalez, 570 F.3d at 22.  Here, however, Paz was not merely an associate of Delgado, but a knowing participant in construction activities that advanced the conspiracy.

[13] Withdrawing from a conspiracy requires that the conspirator "act affirmatively either to defeat or disavow the purposes of the conspiracy."  United States v. Pizarro-Berríos, 448 F.3d 1, 10 (1st Cir. 2006).

Hence, the record contains ample evidence to support the jury's finding that Paz was a member of the conspiracy.

## B. Sentence Enhancement

Paz appeals the two-level sentence enhancement he received for "us[ing] a special skill[ ] in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  We review the district court's factual findings for clear error.  United States v. Prochner, 417 F.3d 54, 60 (1st Cir. 2005).

The Guidelines define a "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  U.S.S.G. § 3B1.3 cmt. n.4.  Paz argues that he and his assistants were "hired to put covers on already existing cavities," and that the skills required to do that do not meet the meaning of a "special skill" as defined in the Guidelines.  The record belies Paz's modest characterization of his work.  His clavos were sophisticated compartments whose construction required more than a layperson's capabilities in carpentry, circuitry, and hydraulics.  As Agent Reyes explained at trial, Paz had replaced a wooden table (a piece of wood covering an open space) in the floor of the Such Is Life with a different, piston-operated table powered by a car battery.  To access the compartment underneath,

a person had to complete an electrical circuit: "out of those screws [in the floor] . . . they selected two screws that went down and connected to [other] screws to make contact. So the person who was to open that needs to know which screws to touch with which cables to open or close it. There was no way for me from the outside to figure it out, because there's so many screws to try to make a combination. . . . I'd be playing the Lotto." The district court did not clearly err in determining that a member of the general public would lack the skills necessary to create such a mechanism.

Paz emphasizes that the offense here is conspiracy -- an agreement -- and contends that no special skill is required to make an agreement. The Guideline, however, applies either to facilitating the crime or concealing it. The purpose of Paz's work was to conceal the conspiracy by making drugs aboard the Such Is Life and the Sheymarie difficult to uncover. As indicated by the testimony of Agent Reyes, Paz achieved that purpose. In sum, there was no error in the district court's application of the two-level enhancement for use of a special skill.

### IV. Marrero's Claims

Marrero makes three arguments particular to his appeal. First, he challenges the constitutionality of the conspiracy statutes as applied to him. Second, he contends that a Petrozziello error resulted in the improper admission of hearsay

evidence and gave rise to a prejudicial variance. Finally, he argues that the district court should have granted his Rule 29 motion for cumulative error. We address these arguments in turn.

## A. As Applied Challenge to the Conspiracy Statutes

Marrero argues that the conspiracy statutes, 21 U.S.C. §§ 846 and 963, are unconstitutional as applied to him because those provisions did not give him fair notice of what constitutes participation in a conspiracy. In other words, he asserts that he did not have fair notice that, by knowingly building secret compartments to smuggle drugs for a drug conspiracy, he could be held accountable as a co-conspirator.[14]

Marrero is correct that the Fifth Amendment Due Process Clause gives him a "right to fair warning of that conduct which will give rise to criminal penalties." Marks v. United States, 430 U.S. 188, 191 (1977). In claiming a violation of that right, Marrero relies in particular on the vagueness doctrine, the aspect of the fair warning requirement that "bars enforcement of 'a statute which either forbids or requires the doing of an act in

---

[14] Since Marrero raises his constitutional argument for the first time on appeal, our review is for plain error. United States v. Diaz, 519 F.3d 56, 65 (1st Cir. 2008). Marrero must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceeding." United States v. Henderson, 320 F.3d 92, 102 (1st Cir. 2003).

terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" <u>United States</u> v. <u>Lanier</u>, 520 U.S. 259, 266 (1997) (Souter, J.) (quoting <u>Connally</u> v. <u>Gen. Constr. Co.</u>, 269 U.S. 385, 391 (1926)).[15]

Judicial interpretations may clarify an otherwise imprecise statute. <u>Id.</u> As Marrero concedes, the parameters of the conspiracy statutes are articulated in our case law. <u>See</u>, <u>e.g.</u>, <u>Burgos</u>, 703 F.3d at 11 (explicating the third element of conspiracy, knowing and voluntary participation). Marrero nevertheless asserts that there is "no clear line" between lawful work on a vessel -- such as installing a GPS, fixing engines, or building cabinets -- and conduct that "make[s] me a member of a conspiracy by mere knowledge of the improper intended use of the vessel and/or my services."

Marrero's argument, however, is flawed because he was not convicted for "mere knowledge" of the drug conspiracy and the conspirators' intent to use his services for unlawful ends. Rather, he was convicted because he was a knowing <u>participant</u> in the conspiracy. Marrero's attempt to characterize his conviction

---

[15] "There are three related manifestations of the fair warning requirement," namely, the vagueness doctrine, the rule of lenity, and the principle that a court's "novel construction of a criminal statute" cannot be applied "to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." <u>Lanier</u>, 520 U.S. at 266 (discussing "fair warning" in the context of Fourteenth Amendment Due Process).

as an arbitrary distinction between otherwise lawful activities therefore misses the mark. In the ancillary functions he identifies, it is not the nature of the defendant's services but the intent with which they are provided that distinguishes the innocent vendor from the co-conspirator.

Hence, Marrero's constitutional challenge fails. The statutes, in conjunction with our case law, gave him fair warning that knowingly participating in a drug conspiracy with the requisite intent could expose him to criminal penalties.[16]

## B. Prejudicial Variance

Marrero contends that the district court erroneously admitted into evidence "hearsay about unrelated conspiracies and this amounts to prejudicial variance." We will untangle Marrero's argument and take the hearsay objection first. We will then address the multiple conspiracy and prejudicial variance arguments.

---

[16] To the extent his constitutional argument is really a mislabeled challenge to the sufficiency of the evidence, his challenge fails. A reasonable jury could have found that he was not "indifferent" to the conspiracy but was, rather, a member of it. See Burgos, 703 F.3d at 11. The jury could have determined that Marrero "ma[d]e it his own," id., by building secret compartments that he knew would advance the conspiracy's objectives of smuggling cocaine for distribution while avoiding police detection. Marrero further demonstrated his intent to join the conspiracy by agreeing to join Retamar on the drug run. Although he later changed his mind and did not go on the drug run, his initial agreement would nevertheless support a reasonable jury's conclusion that he was a member of the conspiracy.

### 1. Hearsay

Marrero challenges the district court's decision to admit the hearsay testimony of his co-conspirator, Paz. Although hearsay testimony generally is not admissible, an out-of-court statement made by a defendant's co-conspirator "during and in furtherance of the conspiracy" is not hearsay and may be introduced into evidence. Fed. R. Evid. 801(d)(2)(E), 802. To admit such evidence, the district court must determine by a preponderance of the evidence that the declarant and the defendant were members of the same conspiracy and that the statement was made in furtherance of the conspiracy. See United States v. Ciresi, 697 F.3d 19, 25 (1st Cir. 2012) (articulating the preponderance standard); United States v. Goldberg, 105 F.3d 770, 775-76 (1st Cir. 1997) (explaining that, following United States v. Baines, 812 F.2d 41, 42 (1st Cir. 1987), statements of a co-conspirator made before the defendant joined the conspiracy are also admissible). In this circuit, the district court's decision to allow testimony under the co-conspirator exception is called a Petrozziello ruling, after United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977).

A court may provisionally admit a statement under Rule 801(d)(2)(E) and defer its final Petrozziello ruling until the close of evidence. Ciresi, 697 F.3d at 25. "To preserve a challenge to a district court's Petrozziello ruling, a defendant must object on hearsay grounds when his or her co[-]conspirator's

- 28 -

statement is provisionally admitted and must renew the objection at the close of evidence." Id. at 25-26. Preserved challenges are reviewed for clear error; unpreserved challenges, for plain error. Id. at 26.

Marrero has specifically identified only one hearsay statement that he contends should not have been admitted: Retamar's testimony that, at their first meeting, Paz told him "it would be done," meaning, the clavo would be built. Marrero objected when that statement was admitted into evidence, citing Petrozziello, and renewed his objection at the close of evidence. Hence, our review is for clear error.

The preponderance of the evidence easily supports the district court's assessment that Paz and Marrero were co-conspirators, just as it supports the court's conclusion that Paz's statement, "it would be done," was made in furtherance of the conspiracy. First, Retamar's testimony made clear that Paz and Marrero were co-conspirators. Retamar testified that Paz and Marrero attended multiple planning meetings with him to discuss building clavos, and that, working together, Paz and Marrero built clavos in both the Sheymarie and the Such Is Life. Second, it is more likely than not that Paz's statement, "it would be done," was made in furtherance of the conspiracy because it could easily be construed as a promise that he and his assistant, Marrero, would construct secret compartments to aid Retamar in smuggling hundreds

- 29 -

of kilograms of cocaine into Puerto Rico. Therefore, the court did not err, much less clearly err, in admitting Paz's statement into evidence.

### 2. Multiple Conspiracies and Prejudicial Variance

Marrero argues that the district court admitted evidence of multiple uncharged conspiracies, giving rise to a variance and prejudicial spillover. A variance occurs when the evidence at trial "proves different facts than those alleged in the indictment," such as when the indictment charges one conspiracy but the evidence supports multiple conspiracies. Dellosantos, 649 F.3d at 116 (internal quotation marks omitted). Three factors guide our assessment of whether the evidence was sufficient to prove that a set of criminal activities comprised a single conspiracy: "(1) the existence of a common goal, (2) overlap among the activities' participants, and (3) interdependence among the participants." Ciresi, 697 F.3d at 26. A single conspiracy may exist even if the participants or their respective roles change over time. Id.

Even if a defendant proves a variance, he must also prove that it was prejudicial. Dellosantos, 649 F.3d at 116. Prejudice may result from evidentiary spillover: "the transference of guilt to a defendant involved in one conspiracy from evidence incriminating defendants in another conspiracy in which the particular defendant was not involved." United States v. Wihbey,

75 F.3d 761, 774 (1st Cir. 1996) (internal quotation marks omitted).   To prevail on an evidentiary spillover claim, the defendant must prove "prejudice so pervasive that a miscarriage of justice looms."  United States v. Levy-Cordero, 67 F.3d 1002, 1008 (1st Cir. 1995) (internal quotation marks omitted).

Marrero attempts to prove a variance by dividing the facts temporally into six sequential conspiracies corresponding to changes in personnel and discrete drug runs.[17]   The evidence, however, points to a single conspiracy involving multiple transactions and players.[18]  First, Marrero concedes that all six of the conspiracies he attempts to distill from the fact pattern share a common goal, namely, to sell drugs for profit.  Second, there is a clear overlap among participants: either Retamar or Irizarry was involved in every aspect of the conspiracy, often

---

[17] The six conspiracies Marrero identifies are: (1) Retamar and Irizarry's drug smuggling work for their former employer; (2) Retamar's work (independent of Irizarry) for their former employer; (3) Retamar and Irizarry's importation of twenty kilograms of cocaine using one of their former employer's boats; (4) the conspiracy charged in the indictment, namely, to import and distribute more than five kilograms of cocaine using the Sheymarie and the Such Is Life; (5) the conspiracy Retamar ran in the time between his split with Irizarry and his arrest; and (6) the sting operation.

[18] The government contends that Marrero forfeited his multiple conspiracies argument for, among other reasons, failing to request a multiple conspiracy jury instruction.  Since Marrero's argument cannot succeed on the merits, we need not decide whether he forfeited it.

working in tandem. Finally, the participants worked interdependently. For example, Marrero provided the secret compartments that Retamar and Irizarry then used to smuggle drugs. Looking "to the totality of the evidence to see if it supports a finding of a single conspiracy," Ciresi, 697 F.3d at 26 (internal quotation marks omitted), we think the evidence at trial proved only one ongoing conspiracy that began when Retamar and Irizarry met and ran until the Such Is Life was confiscated. Hence, there was no variance.[19]

## C. Cumulative Error

In his final argument, for cumulative error, Marrero identifies six motions he submitted to the district court and seeks to incorporate them by reference.[20] The substantive argument for

---

[19] Marrero's best case for a variance is the evidence pertaining to Retamar and Irizarry's work for their former employer. However, the evidence presented on those facts -- the so-called conspiracies #1 and #2 -- comprised no more than a handful of pages of the transcript at the very beginning of Retamar's two-day testimony. Furthermore, that portion of the testimony was aimed at establishing nothing more than how Retamar and Irizarry met and how each knew that the other was involved in drug trafficking. Marrero has not proved that the prejudice resulting from that testimony was "so pervasive that a miscarriage of justice looms." Levy-Cordero, 67 F.3d at 1008 (internal quotation marks omitted).

[20] The six motions are: a motion for judgment of acquittal and/or for new trial (DE 250); two motions to dismiss the indictment (DE 244, 246); two motions in limine regarding the alleged improper use of transcripts (DE 231, 247); and a motion for a sentence below the statutory minimum (DE 363).

- 32 -

cumulative error is limited to the following in his opening brief: "We adopt said documents by reference and request this Honorable Court to evaluate the arguments presented therein, both de novo as well as non harmless cumulative error." As the government asserts, incorporation by reference is an ineffective method of preserving arguments for appeal. See United States v. Orrego-Martinez, 575 F.3d 1, 8 (1st Cir. 2009) (stating that incorporation of arguments by reference has been "consistently and roundly condemned" (internal quotation marks omitted)). Marrero attempts to elaborate in his reply brief, but he does not sufficiently develop an argument in support of any of the six motions.[21] Hence, his cumulative error argument, like the arguments in the motions he seeks to incorporate by reference, is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

---

[21] In support of one of the motions Marrero seeks to incorporate by reference -- a motion to dismiss Count One of the indictment because it allegedly used language permitting the jury to convict him for guilt by association -- he does include a footnote quoting, but not discussing, Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 178-79 (1951), and United States v. Allen, 670 F.3d 12, 16 (1st Cir. 2012). He notes in his reply brief on appeal, "We understand that the nature of the defect in the Indictment is patent and requires no major argumentation." We reject this attempt to bypass our well-established waiver rules.

## V. Conclusion

We conclude that the district court properly instructed the jury on the elements of conspiracy and adequately charged the jury to apply the "beyond a reasonable doubt" standard to its finding on drug quantity. Both of Paz's individual challenges fail: the evidence was sufficient to support his conviction and the district court did not err in applying the two-level enhancement for a special skill. Marrero's challenges also fail: his argument that the conspiracy statutes are unconstitutional as applied to him is meritless, his hearsay and prejudicial variance arguments are unpersuasive, and his cumulative error arguments are waived. Thus, the defendants' convictions and sentences are affirmed.

So ordered.