# United States Court of Appeals
## For the First Circuit

No. 18-2247

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES STEWART-CARRASQUILLO,

Defendant, Appellant.

No. 19-1008

UNITED STATES OF AMERICA,

Appellee,

v.

HAROLD ESQUILIN-MONTAÑEZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Peréz-Giménez, U.S. District Judge]

Before

Barron and Selya, Circuit Judges,
and Katzmann,* Judge.

María A. Dominguez, with whom McConnell Valdes LLC was on the
brief, for appellant Stewart-Carrasquillo.
Jorge L. Gerena-Méndez, for appellant Esquilin-Montañez.
Joshua K. Handell, Assistant United States Attorney, with

_____

* Of the United States Court of International Trade, sitting
by designation.

whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, were on brief, for appellee.

_____

May 17, 2021

_____

**KATZMANN, Judge.** As police intercepted them racing shortly after dawn toward the coast of Ceiba, Puerto Rico, defendants James Stewart-Carrasquillo ("Stewart") and Harold Esquilin-Montañez ("Esquilin") were caught dumping bales of contraband off the side of a turbocharged "fishing" boat loaded, on deck and in plain view, with more than $12 million worth of cocaine (at street value) packed in twenty-five bales with a total weight of more than 1,200 pounds. Not crediting their defense at trial that they were innocent bystanders on a fishing trip where traps were laid into the waters for later retrieval of lobsters, a jury convicted both defendants of various narcotics offenses. They now appeal, claiming that the evidence was insufficient to support the guilty verdicts, that the district court abused its discretion by excluding their homemade video "reenactment," and that prosecutorial misconduct during closing argument warrants reversal. We affirm.

## I. BACKGROUND

### A. Facts

"Since one of the claims addressed in this opinion is a challenge to the sufficiency of the evidence, we recount the facts in the light most favorable to the verdict," United States v. Paz-Alvarez, 799 F.3d 12, 18 (1st Cir. 2015), deferring some details to our analysis of the issues raised on appeal.

In the very early morning of December 10, 2016, while on

- 3 -

a routine patrol off the island's eastern coast, three maritime agents from Puerto Rico's Fuerzas Unidas de Rápida Acción (FURA)[1] -- Sergeant Magaly Diaz-Perez ("Diaz"), Agent Adalberto Del Valle-Jesus ("Del Valle"), and Agent Luis Feliciano -- picked up from the FURA boat's radar an object "moving along a rocky area . . . towards the east of the island of Puerto Rico." In Agent Del Valle's experience, this was not "an area where boats typically travel through" because of the "rough" conditions and "the risk that it entails"; in fact, "the yawls that [he had] . . . seen [in that area] have basically been all engaged in drug trafficking." Describing his experience with drug-smuggling into Puerto Rico, he recounted that a boat bringing in drugs from the Caribbean meets in the waters with another boat for the transfer of the drugs to that vessel, which then returns to the Puerto Rican coast. Cocaine is packaged in kilos, wrapped, soaked in oil, and shaped into bales. According to Agent Del Valle, the boat-to-boat, drug-at-sea transfer of a multi-gram shipment typically requires three or four persons to move the drugs from one boat to another because a typical bale "containing 20 to 25 bricks of cocaine" would weigh in the "range of 50 to 55 pounds," and must be "move[d] . . . quickly" to avoid

---

[1] "FURA is the Spanish acronym for a division of the Puerto Rico Police Department, the name of which can be translated as 'Forces United for Rapid Action.'" Diaz-Roman v. Denis, No. CIV. 08-1420 (GAG), 2010 WL 3069442, at *3 n.2 (D.P.R. Aug. 2, 2010).

- 4 -

detection.

As the FURA agents neared what appeared to be a blue and white fishing boat, Agent Del Valle "notice[d] that the manner in which the water [was] being displaced . . . was not normal," and "[t]he manner in which [the boat] was behaving was not the normal manner in which a fishing vessel conducts itself."  He recalled that the boat "was going fast," and "displacing a large amount of water," indicating that it was "carrying a large amount of weight." This small "fishing" boat was equipped with "two 175-horsepower engines," which, Agent Del Valle testified, were necessary "to master the amount of weight that they ha[d] on the boat."  In his view, "a lower horsepower engine, say 50 or 75 horsepower, would [not] be able to carry such a large amount of drugs."

When they were about forty yards from the boat, Agent Del Valle could make out "three individuals aboard."  He "proceed[ed] to carry out . . . an approach to the stern," at which point he saw "two individuals on the left-hand side of the vessel throwing packages into the water."  Sergeant Diaz also saw black packages being thrown overboard and identified defendants as the "individuals . . . throwing bales overboard." The agents gave "verbal orders to desist from this action" but were ignored.  Agent Del Valle suspected that "they were in all likelihood throwing drugs into the water," and he "readied [his] crew . . . to interdict and intercept the vessel."

- 5 -

The two individuals "continue[d] to throw packages into the water" until the FURA boat was "literally by their side," at which point the fishing boat's "captain swerve[d] the wheel to ram" the agents' boat. The FURA boat instead successfully "rammed their vessel," which finally "stopped the action of throwing packages into the water." The agents then boarded the boat and arrested its captain -- Carrasquillo[2] -- and the other two persons aboard, whom the agents had seen jettisoning the bales -- defendants. Agent Del Valle observed additional bales on an open area in front of the steering wheel.

With the suspects arrested, the agents attempted to recover the evidence strewn about in the water. Sergeant Diaz first tried to retrieve the four bales that defendants had thrown overboard, but she was unable to handle the weight. Agent Del Valle lifted them one-by-one and injured his leg while doing so. The agents eventually succeeded in bringing the four bales back on board.

Undertaking a search of the seized vessel, the agents found three fishing poles on the boat. There was no indication that the "poles had actually been used to conduct any fishing activities that day," nor was there any "bait for fishing,"

---

[2] Juan Carrasquillo-Soto ("Carrasquillo") is Stewart's uncle. Defendants both worked for Carrasquillo in the construction business. He is not a party to these appeals.

- 6 -

"fishing boxes," "lobster boxes," "ice," "food," or "cell phones" on board.

As for contraband, in addition to the four bales the agents had recovered from the water, the agents found another twenty-one bales -- identical to the other four, except that these were dry -- on the boat floor. "[T]ied to the last bale of cocaine" was a "set of weights" weighing between 50 and 70 pounds, which, Agent Del Valle later testified, are "known . . . in the underworld as potala" and "are directly tied to the drug in case [traffickers] need to get rid of it, have it drop down directly to the deep, to the bottom." Agent Del Valle observed that the bales resembled "the traditional manner in which [traffickers] transport . . . drugs over to Puerto Rico" and agreed that, "in [his] 14 years as a FURA boat captain," he had never "seen or intercepted a boat carrying bales like that, that do not contain cocaine, or drugs."

A Homeland Security Investigations ("HSI") Special Agent "opened up" one of the bales "to reveal its content": "bricks neatly packed together, wrapped in a clear plastic wrapping," one of which "was opened up and . . . tested positive to characteristics of narcotics, of cocaine." "[W]hen it was finally counted," the seized cocaine totaled "499 bricks, with a total weight of 577.6 kilograms."

In its chemical analysis of the contraband, U.S. Customs

and Border Protection ("CBP") determined "an average purity rate of 78 percent" and a total drug content of "502,582 grams or the equivalent of 502 kilograms." Because "one kilogram or brick of cocaine traveling into Puerto Rico is worth approximately [$20,000] to $25,000" on the street, the seized shipment was "worth approximately $10 million to [$12.5] million."

## B. Proceedings

A federal grand jury in the District of Puerto Rico returned a three-count indictment charging Stewart, Esquilin, and Carrasquillo with aiding and abetting the possession with intent to distribute a controlled substance onboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70503(a)(1) and 18 U.S.C. § 2 (Count 1); conspiracy to possess with intent to distribute a controlled substance onboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 7053(a)(1) and 46 U.S.C. § 70506(b) (Count 2); and aiding and abetting the possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 3). Carrasquillo pleaded guilty to Count 3 of the indictment and did not proceed to trial. Defendants jointly filed a Motion to Dismiss the Indictment for loss or destruction of exculpatory evidence by the government, namely a "Fish Finder GPS Hummingbird 698." The district court denied the

- 8 -

motion.[3]

Defendants proceeded to a joint trial. At trial, the government presented four witnesses -- FURA agents Del Valle and Diaz, HSI agent Ramos, and CBP specialist Figueroa -- and adduced two stipulations as to the cocaine's purity and weight, as well as to its street value in Puerto Rico. At the close of the government's case-in-chief, both defendants moved for judgments of acquittal under Federal Rule of Criminal Procedure 29, which the district court denied.

Following the Rule 29 ruling, defendants put on evidence

---

[3] As explained by the district court, Esquilin and Stewart sought a maritime expert to inspect a "Fish Finder" device that they claimed was used on the asserted December 10, 2016, fishing trip to place and locate lobster traps. According to the defendants, the fish finder's built-in GPS technology stored the coordinates where lobster traps were placed, and would corroborate the defendants' version of events. Property receipts indicated that the fish finder "was itemized (or accounted for) on the days of, and following the defendants' arrest." The record was not clear "on whether the law enforcement agents involved in the inspection and handling of the property ever removed the Fish Finder from the center console of the vessel." In any event, it was missing. The district court determined that the fish finder evidence "could hardly prove their unwilling or unknowing involvement in the salvage and transportation of $10 million worth of floating cocaine." "At best, that evidence, would provide a tangential portent of corroboration to the defendants' accounts . . . [and] lacks any apparently exculpatory value." Moreover, the district court determined that the defendants had not demonstrated bad faith by the government in the handling of the evidence. Accordingly, it denied the motion to dismiss the indictment. That ruling is not before us. At trial, as noted below, the defendants offered testimony about the fish finder and discussed it during closing arguments, telling the jury that due to "carelessness" and "sloppy and irresponsible" conduct, this "important piece of evidence" was lost and not available to the defense.

in support of their defense that they were not willing participants in a drug trafficking venture but were invitees on a fishing trip who were merely present on a boat when it came upon packages of cocaine in the water. The thrust of their testimony was that Carrasquillo had captained the boat, that the trip began as an uneventful fishing trip where they unloaded lobster traps in the water, that subsequently the boat came upon the packages in the water, namely bales of cocaine packaged in black plastic floating in the water, and that Carrasquillo loaded those packages on to the boat himself because defendants refused to assist.

Stewart testified that around 4 AM on December 10, 2016, he, Esquilin, and Carrasquillo rode to the docks in Carrasquillo's pickup truck with lobster traps, that they then navigated for about one hour off the coast of Puerto Rico, and then laid approximately twenty lobster traps at sea. In support of his claim that the trip was a fishing trip, Stewart testified that as the lobster traps were laid, Carrasquillo would place in a device, a fish finder with a GPS, information about the coordinates, so that he could know where to locate them and the lobsters. After spending about thirty-five minutes laying the traps, Carrasquillo spotted some items floating in the water and alerted defendants. Despite Carrasquillo's incessant and profane directives that defendants aid him in loading the floating items (later identified as bales of cocaine) onto the vessel, they both refused to do so. According

- 10 -

to Stewart, over a span of about forty-five minutes to an hour, the twenty-five packages, some fifty pounds each, were pulled by rope with ease onto the boat solely by Carrasquillo, a fifty-nine year old man who was about "five-eight, five-nine" and "160 to 170 pounds." Stewart explained that he did not touch any of the packages that Carrasquillo loaded onto the vessel because he "presumed that it could be either drugs or money" and his "fear was that somebody would come there and kill us if he saw us taking something that was theirs." About an hour after Carrasquillo had loaded all the packages, he started shouting, "like, crazy, [t]hrow the packages to the water; throw the packages to the water." Stewart testified that Esquilin, who he thought was "scared," reacted and pushed one of the packages to the water, and "some two or three" then fell into the water. In sum, Stewart told the jury that he did not accompany Carrasquillo for the purpose of retrieving drugs, that he had no knowledge that drugs would be found that day, and that he never touched any of the packages that Carrasquillo loaded onto the vessel.

In his defense case, and in support of his contention that the trip was supposed to be a fishing expedition, and that he was a last-minute recruit to the trip, Stewart called Javier Hernandez-Peña ("Hernandez"), a construction worker who had worked for Carrasquillo. He testified that he had planned to go on the fishing trip of December 10, 2016, on Carrasquillo's boat and had

- 11 -

helped him load lobster traps on to the boat the day before, despite having twisted one of his ankles. He testified that he could not join the trip because of the twisted ankle. Stewart's wife, Nancylin Fernandez-Colon, also testified that Carrasquillo came to speak with his nephew for about two minutes on December 9. Finally, Stewart called his pastor as a character witness.

Esquilin did not himself testify, but presented two witnesses in his defense. His wife Nancy Claudio testified that her husband "likes to go fishing." Manuel Valentin-Laureano testified that he was a former FURA maritime officer and that in assisting the defense he had inspected the vessel and sought to obtain the fish finder which had been identified on the Inventory that had been compiled by the government, and which he testified would have been important in establishing that the trip was indeed a fishing trip as Esquilin contended.

At the conclusion of the defense case, defendants again moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court reserved decision on the renewed motions. After the jury returned guilty verdicts on all counts, the court denied the defendants' motions for judgment of acquittal. The defendants filed written post-verdict Rule 29 motions, which the court denied in a written opinion. The district court sentenced each defendant to 121 months of imprisonment, to be followed by five years of supervised release. They now appeal.

## II.  DISCUSSION

### A.  Sufficiency of the Evidence

"We review de novo the district court's denial of a motion under Rule 29 for judgment of acquittal."  United States v. Santos-Soto, 799 F.3d 49, 56 (1st Cir. 2015).  We review the denial of such challenge to the sufficiency of the evidence in the light most favorable to the verdict, "giving 'equal weight to direct and circumstantial evidence.'"  Paz-Alvarez, 799 F.3d at 25 (quoting United States v. Appolon, 715 F.3d 362, 367 (1st Cir. 2013)).  We do not judge credibility; that is the province of the jury.  United States v. Downs-Moses, 329 F.3d 253, 261 (1st Cir. 2003).  "The verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt."  United States v. Rodríguez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010) (emphasis omitted).  The "relevant inquiry is not whether a reasonable jury could have acquitted the defendant, but rather whether a reasonable jury 'could have found that the government proved each element of the crime beyond a reasonable doubt.'"  Paz-Alvarez, 799 F.3d at 25 (quoting Appolon, 715 F.3d at 367).  The government need not succeed in "eliminating every possible theory consistent with the defendant's innocence."  United States v. Trinidad-Acosta, 773 F.3d 298, 311 (1st Cir. 2014) (quoting United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009)),

- 13 -

superseded on other grounds by U.S. Sent'g Guidelines Manual §3B1.2 n.3(a).   Thus, "[d]efendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008) (alteration in original) (quoting United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000)).  That said, "we must 'reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'"   United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)).

At the outset, we review the defendants' claim of insufficiency of evidence to convict under Count 1, charging the defendants with aiding and abetting each other in violation of 46 U.S.C. § 70503(a)(1) and 18 U.S.C. § 2(a).  To convict, the government needed to prove, beyond a reasonable doubt, that the vessel was subject to the jurisdiction of the United States; the material found on the vessel was a controlled substance; and the defendants knowingly or intentionally possessed the controlled substance with intent to distribute it.  The first two elements are not disputed; what is disputed is the third element.  In a case alleging "the defendants' knowing participation in the transportation of a controlled substance . . . the evidence is sufficient to convict if it adequately supports 'the requisite "two-step inference"': (1) that the vessel was engaged in obviously

illegal activity and (2) that each defendant was ready to assist in the criminal enterprise." United States v. Guerrero, 114 F.3d 332, 342 (1st Cir. 1997) (quoting United States v. Jimenez-Perez, 869 F.2d 9, 11 (1st Cir. 1989)).

With respect to the first prong of the two-step inference, abundant precedent yields guidance "when a jury may reasonably infer that a crewman or passenger on a boat had knowledge that the boat also carried drugs," United States v. Carrasco, 540 F.3d 43, 50 (1st Cir. 2008), focusing on facts such as the quantity of drugs aboard, the size and condition of the vessel, the closeness of the crew's relationship, and the absence of a legitimate purpose for the voyage. Guerrero, 114 F.3d at 342. Here, the jury heard evidence that crewmembers defendants were close associates of boat captain Carrasquillo -- as noted, Stewart was Carrasquillo's nephew, and defendants had both worked for Carrasquillo in the construction business. There was evidence of a massive quantity of drugs loaded on to the boat. Indeed, the defendants stipulated that the twenty-five bales on the small, turbocharged vessel were determined to contain 502 kilograms of cocaine, with a street value of $10 to $12.5 million. Such a "quantity of drugs . . . was consistent with an intent to distribute" rather than with "possess[ion] . . . for personal use." United States v. Henry, 848 F.3d 1, 14 (1st Cir. 2017); see United States v. Piedrahita-Santiago, 931 F.2d 127, 131 (1st Cir. 1991)

("[A] relatively small vessel carrying a large quantity of drugs is indicative of knowledge and involvement on the part of the crew."). Further support for a conclusion that the vessel was involved in illegal activity was supplied by Stewart himself, who, regarding the loaded bales, testified that he "presumed that it could be either drugs or money." The conclusion that the vessel was on an illicit endeavor and not on a legitimate fishing trip was supported by Agent Del Valle's testimony that there was no indication that the three fishing poles found on the boat had been used in fishing activities. Moreover, as noted, the police recovered no bait for fishing, fishing boxes, lobster boxes, ice or food when the boat was seized. While the defendants contend that they dropped lobster traps and were unable to prove that because of the loss of their fish-finder GPS, defense witness Hernandez testified that Carrasquillo's boat was not equipped with a wincher, an engine device used to pull up lobster traps. In sum, a rational juror could conclude that the vessel was engaged in illegal activity.

As to the second prong -- that each defendant was ready to assist in the criminal enterprise -- the evidence supports such a conclusion by the jury. A rational juror could infer that defendants were informed of Carrasquillo's plan and that they were not innocent bystanders, as they contend. "The quantity of drugs seized itself suggests strongly that each of the crew members knew

about the boat's drug smuggling purpose because 'drug traffickers would not entrust a multi-million-dollar shipment to anyone in whom they did not have confidence.'" United States v. Angulo-Hernández, 565 F.3d 2, 8 (1st Cir. 2009) (quoting United States v. Rodríguez-Durán, 507 F.3d 749, 760 (1st Cir. 2007)). "[U]nwitting bystanders would not have been hired to participate in the [boat's] obvious illegal transport of millions of dollars' worth of contraband." Guerrero, 114 F.3d at 344; see also United States v. Cuevas-Esquivel, 905 F.2d 510, 515 (1st Cir. 1990) ("It is entirely reasonable for the jury to conclude that conspirators, engaged in conduct which by its nature is kept secret from outsiders, would not allow the presence of innocent bystanders."). As noted, both defendants were associates of Carrasquillo, and moreover, Carrasquillo had spoken with Stewart about the voyage outside the presence of Stewart's family the day before the trip. While the defendants claim that the 59-year-old Carrasquillo alone lifted and loaded the twenty-five bales of cocaine weighing 975 kilograms (or more than 1,200 pounds) into the boat, the jury could have reasonably concluded that given the weight of the contraband and the rocky, treacherous, and shark-infested waters, both defendants must have assisted Carrasquillo in that task. See Downs-Moses, 329 F.3d at 261-62 ("[A] reasonable jury could have found that all twenty-eight bales of cocaine, elaborately and similarly packaged, . . . (weighing 975 kilograms, or more than

- 17 -

2100 pounds) necessitated that a number of individuals participate in its transport . . . ."). The defendants' frantic efforts to unload the cocaine as the FURA police approached, as testified to by two FURA agents, also supports a conclusion that they were willing participants in the conspiracy. While they dispute the agents' testimony identifying them as dumping the cocaine, it is undisputed that there were only three people aboard, with one of them captaining the boat at the time of the interdiction. As defendants acknowledge that the captain was Carrasquillo, a rational juror could have concluded that the two sighted dumpers were the defendants. Even "ancillary . . . services" performed "to advance the conspiracy's objective of avoiding police detection" are sufficient "for a reasonable jury to find that [the defendant] in fact intended to join the conspiracy and advance its goals." Paz-Alvarez, 799 F.3d at 25-26.

In sum, on appeal, as they did in front of the jury, defendants advance their own interpretation for being on board a vessel loaded with more than $12 million worth of cocaine. The jury rejected that explanation. "On appeal, we cannot re-weigh the evidence or second-guess the jury's credibility determinations." Santos-Soto, 799 F.3d at 61. "[I]f the evidence can be construed in various reasonable alternatives, the jury is entitled to freely choose from among them." United States v. Smith, 680 F.2d 255, 259 (1st Cir. 1982). We conclude that the

defendants have not overcome the "daunting hurdles" of a sufficiency challenge. United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006). We uphold the convictions under Count 1 for aiding and abetting the possession with intent to distribute a controlled substance onboard a vessel subject to the jurisdiction of the United States.

We also conclude, as did the district court in its thorough and persuasive Opinion and Order denying the defendants' motions for judgment of acquittal, that the evidence is sufficient to sustain the defendants' convictions under Count 2 (conspiracy to possess with intent to distribute a controlled substance on board a vessel subject to the jurisdiction of the United States) and Count 3 (aiding and abetting the possession with intent to distribute five kilograms or more of cocaine). Although the three offenses of conviction are comprised of distinct elements, the same evidence that permitted the jury to infer that Stewart, Esquilin, and Carrasquillo were working together to bring the cocaine back to shore for distribution supports the jury's verdict as to each. See Carrasco, 540 F.3d at 51 ("Because the jury could have inferred that both men knew of the drugs, it could also have inferred that appellants had agreed to transport them to Puerto Rico for the purpose of distributing them, which is the essence of the conspiracy charge."); United States v. Page, 521 F.3d 101, 109 (1st Cir. 2008) ("Since [the defendant] subsequently helped to

load these bags into the . . . vehicle for transport, the jury reasonably could infer both that [the defendant] had formed the requisite intent to possess that cocaine . . . and further that [the defendant] had implicitly joined in and aided the . . . conspiracy."); United States v. May, 343 F.3d 1, 6 (1st Cir. 2003) ("[B]y having an amount of the drug in his own possession however briefly, [defendant] was 'directly involved' with the drug, which suffices to hold him accountable for the contraband.") (citation omitted); United States v. Romero, 32 F.3d 641, 645 (1st Cir. 1994) (Finding that "[t]he government's evidence of possession was ample" for purposes of determining sufficient evidence existed to support defendants' convictions for possessing, while aboard a vessel subject to jurisdiction of the United States, cocaine intended for distribution, where law enforcement testified they saw people aboard defendants' vessel throwing bales overboard).

## B. **Demonstrative Evidence**

Defendants contend that the district court committed reversible error by excluding a demonstrative aid in the form of a videotaped "reenactment" that they claim directly contradicted the government's case and established Carrasquillo's ability to load twenty-five bales of cocaine onto his boat without their assistance. We are not persuaded.

During both the fourth and fifth day of trial, defendants offered as evidence a homemade video depicting a reenactment of

twenty-five bales being brought on board a vessel by "a normal housewife," a woman of similar age to Carrasquillo. Defense counsel explained that "because the Government has questioned the ability of Juan Carrasquillo to bring those bales on board . . . instead of doing the reenactment with a man, we decided to use conditions that were more onerous, and did the reenactment with a woman of similar age, who was able to load the 25 bales." Defense counsel urged that the video had "[Federal Rule of Evidence] 101 value" and it would be probative in that would help "the jury understand the testimony."

The government opposed admission of the video, stating that the defendants had not "show[n] a similarity of conditions and circumstances" between the original loading of the cocaine and the purported reenactment. The government objected that there was "no indication as to how the bales that were seen floating were actually constructed or packaged"; there was "dissimilarity in terms of the sea conditions"; the boat appeared to be "just slightly off a pier instead of in the middle of the ocean"; "in the video, you can see someone actually captaining the vessel or near the steering console" (in contrast to Stewart's testimony that Carrasquillo, in the middle of the ocean, had left the steering wheel for "40, 45 minutes" in order to "load all of the packages on board," during which time the boat just floated and "was being guided by the currents"); and the reenactment was done

"in the daylight hours."

The district court observed that "the boat [in the video] is not the same" one used by Carrasquillo and the defendants, that the reenactment video "could be confusing to the jury how actually the bales were put on," and that it was of minimal probative value since it was "in the record already" through the "testimony of Mr. Hernandez and Mr. Stewart to the effect that they have seen Mr. Carrasquillo for many years, and they see no weaknesses." After hearing the arguments from counsel, the district court denied admission of the video "reenactment" pursuant to Federal Rule of Evidence 403.

Under Rule 403, a district court may exclude evidence when its probative value is substantially outweighed by the danger of unfair prejudice. United States v. Leoner-Aguirre, 939 F.3d 310, 321 (1st Cir. 2019). "We give great deference to a district judge's balancing of probative value versus unfair prejudice," United States v. Breton, 740 F.3d 1, 14 (1st Cir. 2014), and review that determination for abuse of discretion, Leoner-Aguirre, 939 F.3d at 321. Although we have not had occasion to discuss the exclusion of demonstrative reenactment evidence in a criminal case, we have done so in a civil context. See Fusco v. Gen. Motors Corp., 11 F.3d 259, 264 (1st Cir. 1993) (upholding the district court's exclusion of a video that General Motors had produced and offered as replication of an automobile accident on a test track).

We see no reason not to be guided by the analysis therein.

We observed in Fusco that with demonstrative recreation evidence, "courts have feared that the jurors may be misled because they do not fully appreciate how variations in the surrounding conditions, as between the original occurrence and the staged event, can alter the outcome." Id. Setting forth a "substantial similarity" test, we noted that "[i]n such cases the solution of many courts, including this one, has been to call for substantial similarity in conditions, or to stress the great discretion of the trial judge to exclude the evidence where similarity is not shown, or both." Id. (first citing Swajian v. Gen. Motors, 916 F.2d 31 (1st Cir. 1990); and then citing 1 J. Strong, McCormick on Evidence § 202 (1992)). We further explained:

> [T]he concept of substantial similarity is a flexible one, and ought to be, for the benefits of the demonstration and the dangers of misleading the jury will vary greatly depending upon the facts. We think that the trial judge enjoys great discretion in this area. But here the circumstances were not similar: as in Swajian, the test occurred in controlled conditions, on a test track with a driver expecting the occurrence, and with a doctored piece of equipment rather than one the actually broke.

Id. Applying the teaching of Fusco to the demonstrative video enactment before us, we conclude that the district court did not abuse its discretion in finding that the defendants' proffer failed the "substantial similarity" test. The reenactment occurred "in controlled conditions," off a dock rather than in rocky, open

waters, on a different "piece of equipment" than Carrasquillo's boat, with the boat being captained during the loading rather than left adrift for forty or forty-five minutes.  For these reasons, the district court did not abuse its broad discretion in excluding the evidence under Rule 403.

Finally, we note that in holding that the "substantial similarity" test also applies to recreations in the criminal context, we join other circuits.  See United States v. Jackson, 479 F.3d 485, 489 (7th Cir. 2007); United States v. Baldwin, 418 F.3d 575, 580 (6th Cir. 2005); United States v. Birch, 39 F.3d 1089, 1092-93 (10th Cir. 1994); United States v. Russell, 971 F.2d 1098, 1106 (4th Cir. 1992).  We reiterate that "substantially similar" is a flexible concept; it is not synonymous with "identical."  When a demonstration is admitted, any dissimilarity is fair game for cross-examination.  The application of the substantial similarity test is informed by the purpose for which the purported recreation is offered.  However the proponent characterizes the reason for the introduction of the demonstrative aid, if that demonstration does not permit a fair comparison with the event at issue because it is "insufficiently comparable to the circumstances [of] the case," Swajian, 916 F.3d at 36, then the district court is well within its wide berth as gatekeeper of the evidence in excluding it.

## C. Closing Argument

Defendants contend that the prosecutor's misstatement in closing argument that defense witness Hernandez suffered from a "broken ankle" rather than a "twisted ankle" constituted reversible error. We disagree.

In support of the defendants' contention that they thought that the fishing trip captained by Carrasquillo was a legitimate lobster trip and that they did not understand it to be a drug trafficking venture, Hernandez testified that several days before December 10, 2016, Carrasquillo asked him to accompany him to lay lobster traps at sea. He testified that he planned to make the trip, but on December 9, he told Carrasquillo that he had twisted his ankle and would not be able to join him. Nonetheless, he loaded lobster cages onto the boat. The defense stated to the jury in closing argument that Hernandez was "the person that was supposed to go fishing with Juan Carrasquillo on December the 10th, and it was not until the afternoon before that he told Juan Carrasquillo that he twisted his ankle and couldn't go." The defendants argued that Carrasquillo's testimony supported their claim that they had been recruited at the last minute in light of Hernandez's inability to make the trip in what they understood to be a legitimate lobster expedition: they were not willing participants in a structured and planned drug trafficking venture but were innocent bystanders.

In his closing, referencing Hernandez's testimony, the prosecutor told the jury to "ask [them]selves" if it is "really possible for this individual [Hernandez] to be loading lobster cages with a broken ankle. . . . That's his story. His story is he loaded 20 lobster cages with a broken ankle, he baited them, and then he decided not to go on this fishing trip. What does that tell you?"

When the prosecutor concluded his summation, Stewart's counsel objected that "the testimony was not that Javier Hernandez had a broken ankle. He clearly said he had a twisted ankle, and there is a huge difference between that." Denying the objection, the district court stated that it did not think "it makes a difference" as to whether Hernandez had a broken ankle or a twisted ankle, and also noted that it had "already explained to the jury that it is their recollection that prevails in this case" and not statements made by counsel. In its instructions to the jury following the closing arguments, the court reiterated:

> The argument and the statements by the lawyers are not evidence. The lawyers are not witnesses. Whatever they may have said in their opening statements and in their closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them is the one that controls.

Where a timely objection is lodged to a statement made by the government in closing argument, "[w]e review de novo whether

the challenged portion of the government's closing argument was improper and, if so, whether it was harmful." United States v. González-Pérez, 778 F.3d 3, 19 (1st Cir. 2015) (alteration in original) (quoting Appolon, 695 F.3d at 66). That is to say, "we may reverse [the] convictions on the basis of the prosecutor's remarks only if they were 'both inappropriate and prejudicial.'" United States v. Amaro-Santiago, 824 F.3d 154, 158 (1st Cir. 2016) (quoting United States v. Matías, 707 F.3d 1, 5 (1st Cir. 2013)). We have "fashioned a three prong test for examining whether the [remarks] 'so poisoned the well' that the trial's outcome was likely affected, thus warranting a new trial." United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999) (quoting United States v. Capone, 683 F.2d 582, 586-87 (1st Cir. 1982)). "We examine: (1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have affected the outcome of the case." Id. We thus review the challenged remarks under the three-pronged test.

First, the prosecutor's mischaracterization of Hernandez's twisted ankle as a "broken ankle" was isolated, occurring only twice and fleetingly.

Second, as noted, soon after the closing arguments were finished, the district court gave a cautionary instruction to the

jury that the "argument and the statements by the lawyers are not evidence" and instructed that "[i]f the facts as you remember them differ from the way the lawyers have stated them, your memory of them is the one that controls."  As we have often observed, "juries are presumed to follow such instructions."  Amaro-Santiago, 824 F.3d at 160 (quoting United States v. Rodriguez, 675 F.3d 48, 63 (1st Cir. 2012)).

Third, even if any confusion about the extent of Hernandez's injury and his consequent ability to assist in loading lobster traps survived the district court's curative instruction, it is highly unlikely that any hypothetical misapprehension by a juror would have had any bearing on the outcome of the case.  The prosecution did not discount the possibility that at some point lobster traps may have been present on the boat, and in fact during closing argument reminded the jury "the defense witness [Valentin] himself came up here and told you that lobster traps can be used to disguise drug trafficking."  Whether or not Hernandez would have been able to lift the lobster traps was a tangential matter and not one that would have affected the outcome of the case.

In sum, the fleeting misstatement does not warrant a new trial.

## CONCLUSION

For the reasons stated above, the judgments of conviction are **affirmed.**